[Crim. No. 17558. First Dist., Div. Three. Aug. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN MICHAEL FIELDS, Defendant and Appellant.

## COUNSEL

Michael Stepanian for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**HALVONIK, J.**—Stephen Fields was out for a spin in his red Porsche. It was a brisk January evening; he was approaching the City of Napa with Cheryl Daiprai by his side. Then there was a patrol car, warning lights and the idyll ended.

Highway Patrolman George Butler pulled Fields over and asked to see his license. Fields gave it to him, asking, "Is it my taillight?" Butler took the license and, returning to the patrol car, called for support.

There was nothing wrong with the taillight. A market had been robbed in Napa and Butler had heard a police broadcast about it an hour before. The robber had fled in a red Porsche of about the same year and make as Fields' and, like the description of the robber, Fields was about five feet ten inches tall and dark complexioned.

Highway Patrolman DePugh and Randall Bowman of the Napa police responded to the call. Bowman had interviewed the victim and other witnesses. He knew that the ski-masked robber had driven away without a companion and with a taillight that in fact did not work. He also knew that it would be foolhardy either to assume that the witnesses had in all details been correct or that the robber had not changed his situation and decided to return to Napa. The driver might be an armed robber; it was not a possibility a prudent man would exclude. Bowman and Butler approached the car with their guns drawn and ordered Fields from it. Fields joined the officers at the rear of his car where Bowman told him there had been a robbery and that he and his car matched the description furnished by the victim. It was evident that Fields was unarmed; the officers put their guns away without pat-searching him. Fields was nervous and scared; he was crying; he protested his innocence; he told

the officers that he owned, with his father, a number of markets and that he had been a robbery victim himself. During the conversation, Bowman left a few times and inspected the interior of the Porsche with his flashlight but discovered nothing suspicious.

About 10 minutes later, the victim was brought to the scene and said that Fields was not the robber.

Fields does not complain about his detention. He concedes that the police were justified in pulling him over and holding him until the victim arrived. But Fields does complain about the search of his trunk which occurred in the interim while they waited. That search produced a paper bag containing concentrated cannabis and it is from his conviction for possessing it (Health & Saf. Code, § 11357, subd. (a)) and the concomitant sentence of three years probation, including a warrantless search condition and six months in jail, that he appeals.

The search was at Bowman's direction. By that time, other officers had arrived and there were four police cars around the Porsche. After talking with Fields in back of his car and unearthing nothing by flashlight illumination of the car's interior, Bowman, under the impression that Daiprai was Fields' wife, testified that "I indicated to him [Butler] that I would like her [Daiprai] to open the trunk." What exacly Butler said to Daiprai we do not know for he was not asked about it. Bowman testified that Butler "turned to the female passenger and asked if she would open the trunk." She pulled the latch, Bowman opened the trunk, found the bag, looked in it and saw a leafy vegetable matter.

■ The Attorney General contends that the search was justified because supported by probable cause. That contention collides with *People* v. *Huff* (1978) 83 Cal.App.3d 549 [147 Cal.Rptr. 316] where a police officer received a radio dispatch that an armed robbery had been committed by two black males in their early 20's who were driving an older model blue pickup truck. When he saw an older model blue pickup truck with two black male occupants, he pulled it over and, after pat-searching the detainees, looked in the truck searching for the weapon used in the robbery, found two paper bags containing clothing and seized them. The clothing, it turned out, had been stolen. The court said: "we are confronted with a situation where a police officer, who has cause to detain and question but who lacks probable cause to arrest, undertakes a warrantless search in the hope of discovering evidence to connect defendant with the crime which he is suspected of having committed.

Under existing case law . . . such a search was unlawful . . . ." (83 Cal.App.3d 560.) There is no plausible distinction between *Huff* and this case. The search of Fields' trunk was without benefit of probable cause.

The Attorney General urges, alternatively, that the search of the trunk was a lawful one because consented to by a person (Daiprai) having ostensible authority to permit it. That Daiprai complied with the request, couched in words we do not know, does not demonstrate that she consented to the search. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescense to a claim of lawful authority." (*Bumper* v. *North Carolina* (1968) 391 U.S. 543, 548 [20 L.Ed.2d 797, 802, 88 S.Ct. 1788].) There is a world of difference between requesting one to open a trunk and asking one's permission to look in a trunk. The Attorney General suggests that *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218 [36 L.Ed.2d 854, 93 S.Ct. 2041] obliterates the distinction but in *Schneckloth* the police asked for permission to search the car and were told "Sure, go ahead." (*Id.,* at p. 220 [36 L.Ed.2d at p. 858].) Permission had been requested and granted; the court held that failure to inform the suspects that they could refuse to comply did not necessarily demonstrate that the consent had been involuntary. "But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." (*Id.,* at p. 228 [36 L.Ed.2d at p. 863].) When the police "ask" someone to perform an act which facilitates their access, as distinguished from asking permission to search, it cannot be said there has been no implicit assertion of authority. Especially is that so when one's companion is suspected of a robbery and the police have shown their weapons. The importance of asking *permission,* as an indicia of voluntariness, was explained in *People* v. *James* (1977) 19 Cal.3d 99, 116 [137 Cal.Rptr. 447, 561 P.2d 1135]: " 'The mere asking of permission to enter and make a search carries with it the implication that the person can withhold permission for such an entry or search.' " If one merely asks, instead of asking permission, the essential implication is not carried. Thus where federal revenue agents, in search of illicit whisky, presented themselves at the defendant's door and told his wife that they had come to search the premises, her acquiescence to their entry was held no waiver of constitutional rights "for it is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected." (*Amos* v. *United States* (1921) 255 U.S. 313, 317 [65 L.Ed. 654, 656, 41 S.Ct. 266].) And when a narcotics agent, smelling opium outside a room, knocked

and told the occupant who answered "I want to talk to you a little bit" and she "stepped back acquiescently and admitted us," the search was not consensual because "It was granted in submission to authority . . . ." (*Johnson* v. *United States* (1948) 333 U.S. 10, 12-13 [92 L.Ed. 436, 439-440, 68 S.Ct. 367].)

*Amos* and *Johnson,* approvingly cited in *Schneckloth* for the proposition that the prosecutor has the burden of proving that consent was given freely and voluntarily (412 U.S. at p. 222 [36 L.Ed.2d at p. 860]), perpetuate the line, recognized throughout the law, between consent and assent. ■ " 'Consent, in law, means a voluntary agreement by a person in the possession and exercise of sufficient mentality to make an intelligent choice, to do something proposed by another . . . . [Assent] means mere passivity or submission, which does not include consent.' " (*People* v. *Perez* (1973) 9 Cal.3d 651, 658-659 [108 Cal.Rptr. 474, 510 P.2d 1026], quoting from *People* v. *Dong Pok Yip* (1912) 164 Cal. 143, 147 [127 P. 1031]; cf. *Dunaway* v. *New York* (1979) 442 U.S. 200, fn. 6 [60 L.Ed.2d 824, 832, 99 S.Ct. 2248, 2253].)

■ There is no evidence that Butler asked Daiprai's permission to search the trunk. There is, therefore, no "clear and positive" evidence (*People* v. *James, supra,* 19 Cal.3d at p. 106, fn. 4; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]) that she consented to the search rather than submitting to an implied assertion of authority. Fields' motion to suppress should have been granted.

The judgment is reversed.

White, P. J., and Feinberg, J., concurred.