[Crim. No. 22348. Apr. 3, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MONROE RATLIFF, Defendant and Appellant.

678

## COUNSEL

Gary M. Sirbu, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Norman H. Sokolow, Susanne C. Wylie and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**\*—Defendant James Monroe Ratliff appeals from a judgment imposing the death penalty following his conviction of first degree murder, attempted murder, robbery and burglary (two counts). (See Pen. Code, §§ 187, 211, 459, 664; further statutory references are to this code.) The jury found that defendant personally used a firearm while committing his offenses (§§ 1203.06, subd. (a)(1), 12022.5), and that the attempted murder count involved intentional infliction of great bodily injury (§ 12022.7). The jury also found that the murder occurred during the commission of a robbery, thereby constituting a special circumstance under the 1978 death penalty law (§ 190.2, subd. (a)(17)).

As will appear, we have concluded that the attempted murder conviction must be reversed, the special circumstances finding set aside, and the penalty of death vacated, due to instructional errors including the failure of the trial court to instruct regarding the necessity of finding an intent to kill. (See *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) In all other respects, we will affirm the judgment.

### I. FACTS

In the early morning on Monday, November 3, 1980, Los Angeles police officers were summoned to a San Pedro gas station to investigate a robbery

---

\*Before Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J.

and murder. Attendant Estrada had been shot to death and his associate Castro wounded. Someone had managed to scribble a license plate number on the counter inside the cashier's booth, evidently in accordance with station manager Gomez' earlier directions to jot down the number of any "suspicious" vehicles. Gomez, upon arriving at the scene, estimated that between $175 and $200 were taken, including several $1 bills. Victim Castro described his assailant as a male Black, about 6 feet tall, 200 pounds, wearing a dark blue security guard's uniform.

The license number was traced to defendant, living in Compton. The officers went to defendant's home at 6 or 6:15 a.m. and observed a car bearing the license number in question in an unfenced yard next to the house. The officers approached the house and confronted defendant's father, who confirmed that his son was a security guard and was asleep inside. The officers entered the house with Mr. Ratliff who called to defendant. When defendant appeared, he was told that the officers were investigating a murder.

Defendant subsequently consented to a search of his car. (The facts surrounding the search and defendant's consent thereto are discussed in greater detail below.) The search produced certain incriminating evidence, including $199 in loose currency (mainly $1 bills) in the car's trunk, and a time card identifying defendant as a security guard. The trunk search also revealed three hanging lamps later identified as stolen during the weekend of November 1 and 2 from two homes located at a San Pedro construction site. (These lamps formed the basis for the burglary charges against defendant; they were seized along with other items, discussed below, when the officers conducted a second search supported by a search warrant.)

At trial, victim Castro positively identified defendant as the robber/assailant at the gas station. According to Castro, after demanding money from his victims, defendant fired his gun twice at close range, killing Estrada and wounding Castro. Defendant's former employer verified that defendant had been employed as a security guard and occasionally had worn a navy blue uniform. Dolores Cook, an acquaintance of defendant, testified that on Sunday, November 2, 1980, around 6 p.m., defendant told her that he was going to San Pedro; he was then carrying a firearm. Cook confirmed that defendant's security guard uniform was dark blue in color.

The prosecutor also called Rossie Kendrick who testified that defendant accompanied her to a drive-in movie on one evening of the weekend preceding his arrest (apparently, the weekend of Nov. 1 and 2), that she saw defendant put some money into a box in the trunk of his car, and that she

saw no lamps in the trunk. The couple returned from the movie and sat together outside her house until 12 or 12:15 a.m.

Defendant did not testify in his defense. Instead, he called witnesses who testified that (1) his hands bore no detectable gunshot residue following his arrest, and (2) he had been paid $1,337.67 a few months earlier in settlement of a personal injury action.

At the penalty phase, the prosecutor introduced evidence of a prior robbery conviction and several misdemeanor acts of violence committed against a former girlfriend. Defendant introduced expert testimony regarding his mental state, retardation and impaired judgment under stressful conditions. Defendant's mother and minister also testified regarding defendant's background and character.

The present appeal is automatic. (§ 1239.)

## II. CONTENTIONS

### A. *Unlawful Search*

Defendant first contends that the warrantless car search conducted by the officers immediately following defendant's arrest was illegal and that the fruits of that search should have been ordered suppressed. (See § 1538.5.) According to defendant, his supposed consent to the search was involuntary, being merely an act of submission in the face of authority. He also disputes that the officers had probable cause to search the car and its trunk without his consent and without first obtaining a search warrant. Finally, he argues that the second car search, which produced various items of evidence, was invalid because it exceeded the permissible scope of the warrant issued to authorize that search.

### 1. *Consent to Search*

The arresting officers testified that as soon as defendant's father awakened him, defendant exited the bedroom door in a highly excited state, waving his arms and jumping up and down. Accordingly, one of the officers placed handcuffs on defendant after telling him to calm down. Although defendant's father testified that the officers had drawn their guns when they approached the bedroom, the officers could not recall doing so. Defendant thereafter was taken to the living room and was seated on a couch but not formally placed under arrest. After a few minutes of interrogation, Officer Burkman asked defendant if he objected to a search of his car. According

to the officer, defendant replied "I don't care. Go ahead and look. The only thing in there is my money and my lamps."

Defendant describes the following scenario as supporting his theory that he did not voluntarily consent to the search: He was abruptly awakened by uniformed police officers with drawn guns, handcuffed, interrogated without *Miranda* warnings, and told that unless he consented to a car search the officers would simply obtain a warrant and break into the trunk. In combination, these or similar facts might well lead a trier of fact to conclude that a purported consent to a search was involuntary. In the present case, however, the evidence supporting defendant's version of the event was by no means as clear or uncontradicted as defendant would suggest. As we shall see, viewing the evidence in the light most favorable to the trial court's finding of voluntariness, there was ample substantial evidence to support that finding. ■ (See *People* v. *James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135] ["On appeal all presumptions favor proper exercise" of trial court's power to judge credibility of witnesses, resolve conflicts, weigh evidence and draw inferences, and its findings "must be upheld if supported by substantial evidence"].)

■ Assuming that the officers initially drew their weapons, the evidence did not indicate that any of them kept their guns drawn when, in the living room, the actual request for consent to search was made. (Cf. *People* v. *Challoner* (1982) 136 Cal.App.3d 779, 782 [186 Cal.Rptr. 458] ["Consent to search given in response to a request by an armed officer whose gun is drawn is suspect"].) Defendant relies on *People* v. *Fields* (1979) 95 Cal.App.3d 972, 975-976 [157 Cal.Rptr. 578], where the officers first drew their weapons and then holstered them before requesting a trunk search. But in *Fields,* the court invalidated the search on the primary ground that the officers failed to request permission to search—they merely asked defendant's passenger to open the trunk. As *Fields* states, "There is a world of difference between requesting one to open a trunk and asking one's permission to look in a trunk." (P. 976.) In the present case, Officer Burkman asked defendant if he objected to a search, thereby clearly indicating to defendant that his permission was being requested. We decline to hold that as a matter of law, a consent to search is invalid solely because the officers originally drew their guns when confronting defendant.

■ We have held that the failure to give *Miranda* warnings does not render a consent to search involuntary. (*People* v. *James, supra,* 19 Cal.3d at pp. 114-115.) ■ Similarly, the fact that defendant was handcuffed when his consent was sought does not demonstrate that his consent to a search was involuntary. Instead, that fact is to be weighed in the balance along with all other circumstances bearing on this issue. (*Id.* at pp. 109-

110.) As we stated in *James,* quoting an earlier case, defendant's restraint by handcuffs "'is but one of the factors, but not the only one, to be considered by the trial judge who sees and hears the witnesses and is best able to pass upon the matter.' [Citation.]" (*Id.* at p. 110.)

In the present case, although the officers handcuffed defendant after he became excited and began flailing his hands about, the request for consent to search occurred several minutes later in another room and in the presence of his father. The trial court reasonably could conclude that the handcuffs played no role in defendant's decision to consent to the search.

Finally, although defendant's father testified that one of the officers had threatened to secure a search warrant and break into the trunk unless defendant consented to a search, the trial court was entitled to disbelieve this testimony in favor of the officer's testimony that defendant freely consented to the search upon being asked whether or not he objected thereto. (See *People* v. *Duren* (1973) 9 Cal.3d 218, 233-234 [107 Cal.Rptr. 157, 507 P.2d 1365].) The trial court was also entitled to conclude that even if such a "threat" was made, it merely amounted to a declaration of the officers' legal remedies should defendant refuse to cooperate. (See *People* v. *Ruster* (1976) 16 Cal.3d 690, 699-701 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269].) We conclude that substantial evidence supports the trial court's finding that defendant voluntarily consented to the search of his car.

## 2. *Probable Cause*

In light of our conclusion that defendant voluntarily consented to the initial search of his car, we do not consider the People's alternative theory that this search was supported by the officers' probable cause to believe that the car contained contraband or other seizable evidence. (See *People* v. *Superior Court (Valdez)* (1983) 35 Cal.3d 11, 15-16 [196 Cal.Rptr. 359, 671 P.2d 863].)

## 3. *Second Car Search*

Following the initial car search, the officers procured a search warrant which authorized seizure of the three lamps they had previously seen in the car trunk. During this second search, the officers seized the three lamps as well as a blank time card from a security service and a note with handwritten instructions for driving to a location in San Pedro near the area where the robbery/murder occurred.

Defendant first contends that this second search was "tainted" by the illegality of the initial search, but this contention fails by reason of our

determination that the initial consensual search was proper. ■ Defendant next asserts that the warrant was rendered invalid because the officers failed to advise the magistrate that they had threatened to "bust open" defendant's trunk if he refused consent to a search. (See *People* v. *Cook* (1978) 22 Cal.3d 67, 99 [148 Cal.Rptr. 605, 583 P.2d 130].) As previously indicated, however, the trial court could reasonably conclude that no such "threat" was made, or that it merely consisted of a correct statement of the officers' legal remedies if consent were refused. Failure to disclose such immaterial matters to the magistrate would not taint issuance of the warrant.

■ Finally, defendant suggests that the second car search exceeded the permissible scope of the search warrant. The warrant authorized only a search for the three hanging lamps, which the officers knew (from the initial search) were in the car's *trunk*. The actual search, however, extended to the car's *interior* and turned up a blank time card and "map" to San Pedro. The People argue that the search of the car's interior was supported by probable cause. (See *People* v. *Superior Court (Valdez), supra,* 35 Cal.3d at pp. 15-16.) Without resolving that issue, we simply observe that the foregoing evidence was merely cumulative of much stronger evidence establishing that defendant was indeed a security guard who committed his offenses in San Pedro. Admission of the time card and map clearly was not prejudicial to defendant. (See *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### B. *Identification Evidence*

Defendant next contends that the trial court erred in failing to exclude prosecution evidence regarding victim Castro's identification of defendant at a "live" lineup which followed the photographic lineup and in permitting Castro to identify defendant at trial. Defendant bases his argument upon the theory that the photo lineup which preceded both identifications was unduly suggestive, and that defendant was unfairly foreclosed from proving such suggestiveness by reason of the police officers' negligent failure to preserve the photos which were shown to Castro. These contentions lack merit.

The record indicates that shortly after the robbery/murder, the officers showed Castro a series of photographs which included defendant's photo. Castro picked defendant as his assailant. Either before or after the photo lineup, Castro told the police that he was able to identify defendant because of heavy shadows under his eyes. One of the officers confirmed that defendant's photo showed more pronounced eyeshadows than the other photos. Subsequently, Castro repeated his positive identification of defendant at a live lineup and at trial.

Prior to trial, defendant moved to exclude all evidence of Castro's various identifications of him, based on the assertedly suggestive photograph and the officers' failure to preserve any of the photos. After a hearing on the issue (see Evid. Code, § 402), at which Castro testified that his identification of defendant was based on the robbery and not on the photograph he had viewed, the court ruled that evidence of the photo lineup would be suppressed by reason of the loss of the photos, but that evidence of the live lineup could be admitted[1] at trial, and further that Castro would be allowed to identify defendant at trial. The record indicates that the court believed that Castro's identification was based solely on his independent recollection of the robbery/murder.

The trial court nonetheless also ruled that defendant would be permitted (1) to show that the police had failed to preserve the photo lineup photographs, and (2) to argue that the photo of defendant may have been unduly suggestive and may have influenced Castro's identification.

### 1. *Suggestiveness*

Defendant first contends that the trial court erred in failing to rule upon his claim that the photo lineup was unduly suggestive. The record indicates that the trial court believed Castro's identification of defendant rested upon his independent recollection of the robbery rather than the photograph he had reviewed. The court, nonetheless, ruled that defendant could raise and argue the issue of suggestiveness despite Castro's independent recollection of the robbery. This procedure did not deprive defendant of due process or a fair trial.

While a defendant may attack any lineup, photographic or otherwise, as unduly suggestive (e.g., *People* v. *Lawrence* (1971) 4 Cal.3d 273, 278-280 [93 Cal.Rptr. 204, 481 P.2d 212], cert. den. 407 U.S. 909 [32 L.Ed.2d 682, 92 S.Ct. 2431]), the taint of an unlawful confrontation or lineup may be dispelled if the People show by clear and convincing evidence that the identification of the defendant had an independent origin. (See *People* v. *Martin* (1970) 2 Cal.3d 822, 831-833 [87 Cal.Rptr. 709, 471 P.2d 29]; *People* v. *Caruso* (1968) 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336].) The trial court impliedly found that the People had made such a showing here.[2]

---

[1]The court admitted such evidence conditionally, subject to the People producing a photo of the live lineup for use by defense counsel prior to trial.

[2]That finding was amply supported by Castro's testimony that he viewed defendant during the offense, that his identification was based on his recollection of the robbery, and that there was no question in his mind regarding the correctness of his identification. (See *People* v. *Cooks* (1983) 141 Cal.App.3d 224, 306 [190 Cal.Rptr. 211] [stating factors used in determining reliability of an in-court identification following a suggestive pretrial identification].)

## 2. *Failure to Preserve*

■ Defendant further contends that the merit of his suggestiveness claim was rendered essentially unprovable by reason of the police officers' negligent failure to preserve the photo lineup photographs. He asserts that an appropriate sanction would have been to order suppressed *all* identification testimony by Castro since such evidence might have been tainted by the suggestive photo lineup. (See *People* v. *Nation* (1980) 26 Cal.3d 169, 175-178 [161 Cal.Rptr. 299, 604 P.2d 1051]; *People* v. *Hitch* (1974) 12 Cal.3d 641, 653 [117 Cal.Rptr. 9, 527 P.2d 361].)

Where, as here, the loss or destruction of photographs used in a pretrial identification is merely negligent or inadvertent, the usual remedy is to suppress evidence of that identification. (*People* v. *Posten* (1980) 108 Cal.App.3d 633, 646 [166 Cal.Rptr. 661].) Our *Hitch* decision does not require suppressing evidence of a *subsequent* in-court identification found to have been independently derived from the witness' recollection of the event, untainted by the photographic identification. (*Id.* at pp. 646-647; *People* v. *Dewberry* (1974) 40 Cal.App.3d 175, 181 [114 Cal.Rptr. 815].) Defendant was given the opportunity to demonstrate that the photo lineup was unduly suggestive, and that remedy constituted an ample deterrent for future negligent behavior of this kind. (See *In re Michael L.* (1985) 39 Cal.3d 81, 87 [216 Cal.Rptr. 140, 702 P.2d 222] [exclusion of seemingly reliable in-court identification unwarranted as remedy for erased videotape]; *People* v. *Bailes* (1982) 129 Cal.App.3d 265, 273-274 [180 Cal.Rptr. 792] [lost photograph of thumb print location]; *People* v. *Posten, supra,* 108 Cal.App.3d at p. 646 [lost "mug book" photos warranted suppression of pretrial identification but not of independent in-court identification].)

We conclude that the trial court did not err in admitting the live lineup and in-court identifications of defendant.

### C. *Prosecutorial Misconduct*

■ Defendant next argues that the prosecutor committed prejudicial misconduct when he referred in his jury argument to the fact that victim Castro had previously identified defendant at the preliminary hearing, a fact not in evidence. Defense counsel failed to object to this reference, however, and accordingly the objection was waived. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) Moreover, the prosecutor's brief remark could not have harmed defendant in light of the positiveness of Castro's in-court identification.

■ Defendant also complains of another statement by the prosecutor remarking on the failure of the defense to present any evidence, such as

alibi testimony, to show that defendant did not commit the charged offenses. ("Now, is there any evidence on the other side? Any evidence at all? None has been presented to you. Absolutely zero has been presented to you by Mr. Ratliff and his attorney . . . .") Defendant now contends that the statement was improper because it (1) implied that defendant had a burden of proving his innocence, and (2) diminished his constitutional right to remain silent (see *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]).

As the People correctly observe, defendant failed to object to the prosecutor's statements, thereby waiving his present objections. (*People* v. *Green, supra,* 27 Cal.3d 1, 27.) Moreover, the prosecutor's statements were not objectionable on either ground asserted by defendant.

None of the prosecutor's remarks suggested that defendant had a burden of proof which he failed to carry, and the court's jury instructions confirmed that the People had the entire burden of establishing defendant's guilt. Indeed, in the course of observing the paucity of evidence exculpating defendant, the prosecutor also candidly acknowledged that the defendant "doesn't have to prove a darn thing."

Nor were *Griffin* principles violated by the prosecutor's argument. As we recently explained, the *Griffin* rule forbids any reference to a defendant's failure to take the stand in his defense, but "that rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. [Citation.]" (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213] [prosecutorial comment on defendant's failure to produce alibi witnesses]; see *People* v. *Burns* (1969) 270 Cal.App.2d 238, 247 [75 Cal.Rptr. 688] [comment that no defense evidence was produced].)

### D. *Defense Counsel's Incompetence*

Defendant complains of various acts or omissions on trial counsel's part which assertedly demonstrated his incompetence. Nothing on the face of the record, however, discloses that counsel failed to act in a reasonably diligent and competent fashion, resulting in the loss of a potentially meritorious defense or adversely affecting the defense of the case. (See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859 2 A.L.R.4th 1].)

Defendant first argues that trial counsel should have moved to sever the burglary count from the robbery/murder counts, so that the same jury

would not hear testimony regarding all these crimes. (See *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447-454 [204 Cal.Rptr. 700, 683 P.2d 699].) The burglary count was based on the three hanging lamps found in defendant's car following the searches previously discussed. The evidence disclosed that, at some time during the weekend immediately preceding the robbery/murder, someone had broken into several houses at a construction site at Miraflores Park in San Pedro and had stolen three light fixtures later identified as the ones found in defendant's trunk.

Although defense counsel failed to move to sever the burglary count from the remaining counts, such omission might well have been based upon counsel's reasonable assumption that such a motion would have been denied. Defendant concedes that the counts originally were properly joined, involving felonies of the same statutory class. (See § 954.) Moreover, evidence of the burglary was relevant to the robbery/murder charges, placing defendant in the San Pedro area during the time when these latter offenses were committed. (See *Williams, supra,* at pp. 448-449 [cross-admissibility of evidence ordinarily dispels any possibility of prejudice from denial of severance].) Finally, neither the burglary charge nor the robbery/murder charges were particularly "weak," thus making it unlikely that joinder was intended to produce a conviction which otherwise might not have been obtainable. (*Id.* at pp. 453-454.) Thus, it is not reasonably probable that defense counsel's omission resulted in any substantial prejudice to defendant's case.

■ Defendant also contends that trial counsel failed to raise a hearsay objection to Officer Burkman's testimony regarding victim Castro's identification of defendant at the live pretrial lineup. (See Evid. Code, § 1238, subd. (c); *People* v. *Mayfield* (1972) 23 Cal.App.3d 236, 241 [100 Cal.Rptr. 104].) Counsel's omission could not have prejudiced defendant, however, because (as he acknowledges) the same testimony readily could have been presented by victim Castro himself, who identified defendant at trial. Indeed, the availability of Castro for this purpose may have convinced trial counsel that any objection to Officer Burkman's testimony would have been pointless.

■ Defendant suggests that counsel's inept cross-examination of prosecution witnesses "frequently" elicited harmful responses. Cross-examination is, of course, fraught with risk—the most skilled examiner can seldom predict precisely what responses will be forthcoming. Our review of the record in this context discloses no conduct on counsel's part which demonstrates his incompetence.

■ Likewise, counsel's failure to object to various photographs of victim Estrada cannot be deemed prejudicial incompetence. In a murder case,

such photos are routinely offered and admitted for various purposes, such as to demonstrate the method or manner of death, the type of wounds, the position of the body or bodies, and other possibly relevant circumstances. Although it is unclear whether all of the photos involved here were relevant to any contested issues in the case, defendant does not contend that they were particularly gruesome. In light of the overwhelming evidence of petitioner's guilt of the murder charge, however, any error in admitting them was harmless. (See *People* v. *Turner* (1984) 37 Cal.3d 302, 320-321 [208 Cal.Rptr. 196, 690 P.2d 669].) Accordingly, counsel's failure to object to their admission cannot be deemed prejudicial incompetence.

■ Defendant asserts that counsel improperly failed to object to asserted prosecutorial misconduct in referring to a fact not in evidence, namely, victim Castro's identification of defendant at the preliminary hearing. As previously discussed, however, the asserted "misconduct" was harmless, and defense counsel's decision not to object cannot be deemed prejudicial.

■ Finally, defendant asserts that trial counsel's closing argument at the guilt phase was "disorganized and often incoherent." We have examined the record in this regard, and although counsel showed instances of confusion or misstatement, his argument was certainly within the range of reasonable competence expected of an attorney responsible for defending a murder charge supported by overwhelming evidence, including the eyewitness testimony of one of the victims.

We conclude that defendant has failed to establish the incompetence of his trial counsel.

### E. *Instructional Errors*

### 1. *CALJIC No. 2.11*

■ The trial court properly instructed the jury at the guilt phase regarding the presumption of defendant's innocence and the People's burden of proving guilt beyond a reasonable doubt. The court also instructed that "Neither side is required to call as witnesses all persons who may have been present at any of the [pertinent] events . . . or who may appear to have some knowledge of these events, or to produce all objects or documents mentioned or suggested by the evidence." (See CALJIC No. 2.11.) We note that the language of CALJIC No. 2.11 has been frequently upheld. (*People* v. *Wein* (1958) 50 Cal.2d 383, 402-403 [326 P.2d 457]; *People* v. *Orozco* (1981) 114 Cal.App.3d 435, 447-448 [170 Cal.Rptr. 604]; *People* v. *Simms* (1970) 10 Cal.App.3d 299, 313 [89 Cal.Rptr. 1].)

Defendant nonetheless argues that this instruction implied, contrary to the other instructions, that defendant had a duty to call at least *some* witnesses or present some evidence to establish his innocence. To the contrary, we do not think that the instruction raised any such inference, and the reasonable doubt instructions were certainly sufficient to negate or dispel any implication that defendant had to introduce some exonerating evidence. In any event, we note that in fact defendant *did* call some witnesses at the guilt phase, thereby reducing the likelihood of any prejudice from the instructions.

### 2. *CALJIC No. 4.50*

Defendant next contends that the trial court erred in refusing to instruct the jury regarding defendant's reliance upon an alibi defense. This instruction (CALJIC No. 4.50) would have told the jury that defendant had introduced evidence that he was not present at the time and place of the offense, and that he should be acquitted if the jury had a reasonable doubt that defendant was present when the offense was committed.

Technically, the requested instruction was inapposite because defendant never affirmatively presented an alibi defense. A *prosecution* witness, Rossie Kendricks, testified that she and defendant attended a drive-in movie on one night of the weekend in question, and then drove to her home and talked until 12 or 12:15 a.m. Another prosecution witness, victim Castro, testified that he arrived at the gas station around 12:15 on Monday morning, and that the robbery commenced around 12:20 a.m. Defendant concedes that such testimony would not afford a solid alibi defense, but he argues that, crediting Kendricks' testimony, it was "improbable" that defendant could have arrived at the gas station in time to commit the offenses.

The defendant is entitled to have the jury instructed on the law applicable to the evidence he presents; doubts as to the sufficiency of the evidence to warrant an instruction should be resolved in favor of the accused. (*People v. Wilson* (1967) 66 Cal.2d 749, 762-763 [59 Cal.Rptr. 156, 427 P.2d 820]; *People v. Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) Although the value of Kendricks' testimony to the defense was indeed doubtful, given her inability to recall the day on which her date with defendant occurred, nevertheless we may assume arguendo that her testimony afforded some basis for an alibi instruction. The refusal of the trial court, however, to give such an instruction was harmless error for it is not reasonably probable that a result more favorable to defendant would have been reached had an alibi instruction been given. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In light of victim Castro's positive identification of defendant and the additional circumstantial evidence of defendant's guilt set

forth above, it is quite unlikely that the jury would have accepted an alibi defense.

### 3. *CALJIC No. 8.11*

██ With respect to his attempted murder conviction, defendant observes that the jury was never instructed that a specific intent to kill was required, or that the implied malice instructions were inapplicable to the attempted murder charge. (See *People* v. *Collie* (1981) 30 Cal.3d 43, 62 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 763-764 [175 Cal.Rptr. 738, 631 P.2d 446].) Indeed, the People *concede* that the trial court erred in instructing on implied malice in the context of attempted murder, but they argue that the error was harmless under the evidence in this case. We disagree.

According to the People, "the reference to an implied malice theory [with respect to the attempted murder charge] was nonprejudicial because there can be no question on the facts of this case that the jury found that appellant had the specific intent to kill Mr. Castro and would have found so even without the reference to implied malice." (See *People* v. *Ramos* (1982) 30 Cal.3d 553, 584, and fn. 13 [180 Cal.Rptr. 266, 639 P.2d 908].) The People point to evidence indicating that defendant shot Castro at close range immediately after demanding money from victim Estrada and shooting him. No struggle ensued with either victim which might indicate an accidental shooting or self-defense.

The foregoing evidence, however, is far less conclusive of the intent issue than the People claim. Although it seems clear that defendant had the *intent to shoot* and thus disable his victims, there was no further evidence of a specific *intent to kill* necessary to sustain an attempted murder conviction. Nor can we infer an intent to kill from the jury's murder-with-special-circumstances verdict as to victim Estrada because (as discussed below) that verdict was based solely on a felony-murder theory, and the jury was never told that an intent to kill was required to sustain such a finding. (See *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131.) Finally, contrary to the People's assertion, the prosecutor's remarks during closing argument did not suffice to clarify the issue. After informing the jury that attempted murder requires malice, "either express or implied," the prosecutor explained that malice "is an intention to kill." But he then muddied the water by referring to "either a clear, express intention to kill *or an implied intention* . . . ." (Italics added.)

Without presently deciding whether the error in instructing on implied malice in an attempted murder context is reversible per se, or only revers-

ible on application of the so-called *Chapman* or *Watson* tests of prejudicial error (see *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 765 [*Watson* standard]; *People* v. *Acero* (1984) 161 Cal.App.3d 217, 229 [208 Cal.Rptr. 565] [reversible per se]), we conclude that under any standard the error was prejudicial here.

Our decision in *People* v. *Johnson* (1981) 30 Cal.3d 444, 447-449 [179 Cal.Rptr. 209, 637 P.2d 676], seems controlling. There, the defendant fired two shots at close range at the intoxicated victim who had reached into defendant's car after blocking his passage and uttering racial obscenities. In a prosecution for attempted murder and other crimes, the jury was instructed regarding implied malice. We reversed, holding that the jury reasonably might have relied upon the implied malice instructions to find attempted murder without considering whether defendant entertained an actual intent to kill his victim. We impliedly concluded in *Johnson* that the defendant's act of shooting his victim at close range did not so conclusively demonstrate an intent to kill as to render harmless the error in instructions. That conclusion would appear to apply with equal force here, where defendant's true intent may have been simply to disable his victims to prevent them from following him or calling the police. Accordingly, the attempted murder conviction must be reversed.

### 4. *Supplemental Instruction on Burglary Charge*

During closing arguments in the guilt phase, defense counsel set forth his personal theory of the case, namely, that although defendant may have committed a burglary of the construction site homes and may have stolen three lamps, he did not rob or shoot anyone at the gas station. The jury thereafter interrupted its deliberations to inquire regarding the effect of defense counsel's concession that defendant had committed burglary; the jury asked whether the concession indicated that defendant was pleading guilty to the burglary charge.

Trial counsel each stipulated that the court could respond to these inquiries in their absence, and the court subsequently instructed the jury without objection that (1) defense counsel in his argument had conceded defendant's guilt of burglary, and that "If the jury so finds, then they would find him guilty," (2) defendant had not changed his not guilty plea to the burglary charge, and (3) because of counsel's concession, "unless the jury does not believe that the evidence shows [commission of burglary], the jury will so find." █ Defendant now contends that the court's latter remarks "created a presumption of guilt," thereby nullifying the court's previous instructions regarding the People's burden of proof.

The trial court's remarks were indeed confusing, but no prejudicial error occurred in light of the overwhelming evidence of defendant's guilt of burglary, an offense to which he offered no defense. Moreover, the jury was given proper instructions regarding the People's general burden of proof in criminal cases. For these reasons, any subsequent instructional error was harmless beyond a reasonable doubt. (See *Chapman* v. *California, supra*, 386 U.S. 18.)

■■■ Defendant also questions the propriety of counsel's concession that he committed burglary; defendant suggests that such a concession is tantamount to a guilty plea requiring defendant's personal waiver of his constitutional rights. (Cf. *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592, 604-605 [119 Cal.Rptr. 302, 531 P.2d 1086].) We disagree. Counsel's tactical decision to argue a particular personal view of the evidence, indicating that his client may have committed only a lesser offense, is not akin to pleading guilty to that offense. ■■■ Once a defendant has elected to proceed with a contested trial, rather than plead guilty or accept sentencing based upon a preliminary examination transcript, the manner of presenting evidence to the jury becomes one of trial tactics properly vested in counsel, at least in the absence of a conflict between counsel and his client. (See *People* v. *Hill* (1971) 19 Cal.App.3d 306, 315-316 [96 Cal.Rptr. 813].)

■■■ As we stated in *People* v. *Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149], "it is entirely understandable that trial counsel, given the weight of incriminating evidence, made no sweeping declarations of his client's innocence but instead adopted a more realistic approach, namely, that *although defendant and others may have committed both burglaries, and may have aided and abetted the acts of violence which caused the victims' deaths,* nonetheless any such acts were unpremeditated and lacked the requisite deliberation and intent to kill . . . . '[G]ood trial tactics demanded complete candor' with the jury. [Citation.] Under the circumstances we cannot equate such candor with incompetence." (Italics added.)

Imposition of a duty to obtain personal waivers of constitutional rights whenever such tactics are anticipated could substantially interfere with counsel's tactical conduct of the trial. Accordingly, we decline to require such personal waivers in these circumstances. (See *People* v. *Frierson* (1985) 39 Cal.3d 803, 818, fn. 8 [218 Cal.Rptr. 73, 705 P.2d 396] [no personal waivers required where defense counsel elects to rest his case without putting on a defense].)

### F. *Special Circumstances Finding*

As indicated previously, the jury found that the murder of victim Estrada occurred during the commission of a robbery, thereby constituting a special

circumstance permitting imposition of the death penalty. (§ 190.2, subd. (a)(17).) Defendant correctly observes that the trial court failed to instruct the jury that the foregoing felony-murder special circumstance could not be found to exist unless defendant intended to kill his victim. (See *People* v. *Garcia* (1984) 36 Cal.3d 539, 547-549 [205 Cal.Rptr. 265, 684 P.2d 826]; *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, 153-154.)

The People concede that *Carlos* error occurred here, and that under *Garcia* such error is ordinarily reversible per se. They argue, however, that the error was not prejudicial because the evidence "establishes appellant's intent to kill Juan Estrada." One exception to the *Garcia* rule of per se reversible error exists where the parties recognized that intent to kill was at issue, they presented all evidence available on that issue, and the record establishes such intent as a matter of law, the contrary evidence being unworthy of consideration. (See *People* v. *Garcia, supra,* 36 Cal.3d at pp. 554-555.) We conclude that this exception does not apply here.

The People suggest that "the very method of killing" Estrada established defendant's intent to kill him. As we previously observed in the context of the evidence of defendant's attempted murder conviction, however, the fact that defendant shot his victims at close range, though certainly strongly indicative, was not conclusive evidence of an intent to *kill,* but may have merely demonstrated an intent to *disable.* (See also *People* v. *Hayes* (1985) 38 Cal.3d 780, 787-788 [214 Cal.Rptr. 652, 699 P.2d 1259].) Thus, it cannot be said that the record establishes an intent to kill *as a matter of law.* Additionally, defendant introduced evidence *during the penalty phase,* which indicated that defendant had suffered brain damage which may have impaired his judgment under stressful conditions. Had defendant realized that his intent to kill was relevant to the special circumstances charge, as well as the lesser attempted murder charge, he might well have chosen to submit such evidence as bearing upon his ability to form such an intent, rather than postpone the presentation of such evidence until the penalty phase. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 771 [215 Cal.Rptr. 1, 700 P.2d 782]; *People* v. *Armendariz* (1984) 37 Cal.3d 573, 578 [209 Cal.Rptr. 664, 693 P.2d 243]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 148-149 [207 Cal.Rptr. 800, 689 P.2d 430].) Accordingly, we cannot say that defendant introduced at the guilt phase all pertinent evidence on the intent issue. We conclude that the special circumstances finding must be set aside.

## G. *Other Contentions*

By reason of the foregoing *Carlos/Garcia* analysis, we need not reach the single penalty phase issue raised by defendant, namely, the trial court's

error in reading to the jury the "Briggs" commutation instruction found invalid in *People* v. *Ramos, supra,* 37 Cal.3d 136.

Defendant's attempted murder conviction is reversed, and the special circumstances finding and penalty judgment are set aside. The judgment is affirmed in all other respects.

**LUCAS, J.,** Concurring and Dissenting.—I concur with the judgment to the extent it affirms defendant's conviction of first degree murder, robbery and burglary, and reverses his conviction of attempted murder. I dissent, however, from the setting aside of the special circumstances finding and penalty judgment by reason of *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. For reasons I have previously expressed, I strongly disagree with the holdings in those cases (see *People* v. *Whitt* (1984) 36 Cal.3d 724, 749 [dis. opn.] [205 Cal.Rptr. 810, 685 P.2d 1161]), and I can no longer concur in judgments of reversal based thereon (see *People* v. *Guerra* (1985) 40 Cal.3d 377, 389-390 [220 Cal.Rptr. 374, 708 P.2d 1252]).