Filed 5/21/14  P. v. Ho CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B243072 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA076741) |
| v. | |
| JACK DUC HO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Suzette Clover, Judge.  Modified and, as modified, affirmed with directions.

Buckley & Buckley and Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Lezskay and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jack Duc Ho appeals from the judgment entered following his convictions by jury on count 1 – making premises available for the manufacture of controlled substances (Health & Saf. Code, § 11366.5, subd. (a)), count 2 – cultivation of marijuana (Health & Saf. Code, § 11358), and count 3 – theft of utility services worth more than $400 (Pen. Code, § 498, subds. (b), (d)), following the denial of his suppression motion (Pen. Code, § 1538.5).  The court sentenced appellant to prison for three years, suspended execution thereof, and placed appellant on formal probation for three years.  We modify the judgment and, as modified, affirm it with directions.

### FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established on April 28, 2009, Los Angeles County Sheriff's Detective Joseph Morales was conducting surveillance of the front house at 2725 Del Mar, and a rear house at 2727 Del Mar, in Rosemead.  The two houses were on one lot in a residential neighborhood.  Appellant owned both houses.  The rear house consisted of upper and lower units, and each was accessed through a separate security door.  A carport was between the two houses.  While conducting surveillance, Morales twice saw appellant leave the front house and walk towards the rear house.  On one occasion, a few minutes passed before appellant returned to the front house.

Morales obtained a search warrant for the rear house.  About 3:30 p.m. on April 28, 2009, Morales entered the lower unit and saw marijuana, and a marijuana rooting compound, in the kitchen refrigerator.  The lower unit contained documents bearing the name Thanh Duc Ho (Thanh).  Thanh was appellant's brother.  The lower unit also contained a car key in a shoebox in a closet, and a Southern California Edison (Edison) electric bill in the name of codefendant Coong Hau.[1]  The car key was for a Honda Pilot parked in the carport.  The Honda was registered to Thanh and Hau.  While Morales was in the lower unit, he heard a buzzing noise coming from the upstairs unit.

---

[1]     Hau is not a party to this appeal.

2

Morales testified the garage contained "marijuana grow products" and a 2008 Mercedes registered to Ji Junjie, Thanh's girlfriend. The Mercedes contained $70,000 in cash. The center console of the Honda contained two receipts, one dated July 15, 2008, for marijuana growing products.

Morales approached the door to the upstairs unit and smelled a slight odor of marijuana. Morales also testified he was inside the lower unit, or outside, when he first smelled marijuana. About 5:00 p.m., Morales opened the door to the upstairs unit and the odor of marijuana was overpowering. The upper unit had six bedrooms, each of which was a marijuana cultivation room including irrigation, ventilation, and lighting systems. The rooms' windows were boarded up with drywall.

The marijuana in each room was at a different growth stage, except marijuana in one room had been harvested and there were no marijuana plants in that room. Most of the rooms' doors were open. There were 968 marijuana plants in the upstairs unit. An electrical bypass system was installed in the upstairs unit with the result Edison was providing electricity to the upper unit only and the electricity was not being registered on the Edison meter. As a consequence, Edison provided electricity worth $14,483 without compensation. Starting in March 2008, electricity for the rear house was billed to Hau. A trash can outside the rear house contained trash related to marijuana grow products.

Morales went to the front house and contacted appellant, who was inside. After obtaining a search warrant, Morales searched the front house and saw a safe containing appellant's passport and $20,040, mostly in $100 bills. The dining room contained an unsigned proposed rental agreement asserting appellant lived in the front house and was renting the rear house to Hau. Deputies recovered $17,350 hidden in shoes in the northeast bedroom, $447 on a dining room table, and, on the kitchen table, keys to the security doors of the upper and lower units of the rear house. The northeast bedroom had men's clothing. Deputies found on appellant's person keys to the upper and lower units of the rear house, and a key to a van parked at the location. The van had a carpet cleaning logo.

3

Los Angeles County Sheriff's Deputy Michael Gaisford, a narcotics expert, testified as follows. The marijuana in the rear house would produce mature plants in 60 to 90 days, and the harvest would be between 180 to 240 pounds of marijuana with a value between $486,000 and $768,000. Gaisford opined Thanh was living at the rear house and was an active participant in marijuana cultivation.

2. *Defense Evidence.*

In defense, business records for various years reflected Jack Ho Carpet Cleaning was located at 2725 Del Mar in Rosemead. Lien Ho (Lien), appellant's daughter, testified as follows. Appellant had been a carpet cleaner for the last 10 years. Appellant's first language was Chinese and he only spoke a few words in English. In 2009, only Hau and Cu Cuu Ho (Lien's aunt) (not Thanh) lived in the rear house. Lien did not know what activities were occurring daily in the front and rear houses.

### ISSUES

Appellant claims (1) the trial court erroneously denied his Penal Code section 1538.5 suppression motion, (2) the evidence of the money in the front house was irrelevant and excludable under Evidence Code section 352, (3) insufficient evidence supported his convictions on counts 1 and 3, (4) the trial court erroneously instructed the jury as to count 1 that only the distribution of a controlled substance had to be for sale or distribution, (5) cumulative prejudicial error occurred, (6) Penal Code section 654 barred punishment except on count 1, and (7) the sentencing minute order must be corrected.

### DISCUSSION

1. *The Trial Court Properly Denied Appellant's Suppression Motion.*

    a. *Pertinent Facts.*

        (1) *Suppression Hearing Evidence.*

            (a) *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597 (*Leyba*)), the evidence presented at the hearing on appellant's Penal Code section 1538.5 suppression motion established as follows. About 3:30 p.m.

4

on April 28, 2009, Morales began executing the search warrant for the rear house and ultimately found inside nearly 1,000 marijuana plants being cultivated.

The rear house was directly behind the front house. After deputies secured the rear house, Morales and three other deputies went to the front house and knocked on the door. Appellant answered. Morales contacted appellant perhaps 15 minutes after Morales cleared the rear house. At the front house, the deputies' weapons were drawn but not pointed at appellant. Appellant's demeanor was cooperative although he perhaps was a little nervous.

Morales asked appellant to come outside and he complied. Appellant was not handcuffed until later, i.e., when he was arrested. Shortly after Morales contacted appellant, Morales determined appellant did not speak English and Morales summoned a translator. Morales detained appellant and removed him from the front of the front house. Deputies conducted a protective sweep of the front house. Appellant was standing outside the front house, perhaps near the curb. The sweep lasted about a minute.

Appellant was placed in the back of a police car until the translator, Los Angeles County Sheriff's Deputy Cong Ha, arrived. Morales testified appellant was in the police car "probably about maybe 25 minutes" before Ha arrived. Morales interviewed appellant with Ha translating and, during the interview, only those three were present. During Morales's contact with appellant, no guns were drawn on him. Ha *Mirandized* appellant in Morales's presence. Appellant was not under arrest. When Ha gave appellant the *Miranda* advisements, appellant was not told he was not under arrest.

During Morales's interview of appellant through Ha, Morales asked appellant if he knew the owner of the rear house and appellant said he knew the people back there very well. The prosecutor asked Morales if appellant indicated "whether or not" appellant owned the rear house property, and Morales replied appellant eventually did. Appellant told Morales the resident of the rear house was a family member.

5

Appellant told Morales appellant and Hau were co-owners of a Honda in the carport between the front and rear houses. At some point while Morales was contacting appellant, Los Angeles County Sheriff's Deputy Cabadas showed to Morales a receipt Cabadas found in the center console of the Honda. The receipt was for hydroponic equipment and was made out to a person named Sam. Appellant told Morales appellant lived in the front house. Appellant denied knowing marijuana was being grown in the rear house. Appellant denied he had anything illegal, or large sums of cash, in the front house.

Morales asked appellant for consent to search his home for illegal marijuana, contraband, or contraband consistent with the growth of a large amount of marijuana. Appellant indicated none of those items would be in his home. Morales commented to appellant about a consent to search form (form) (People's exh. No. 3) and Ha translated those comments. Perhaps 15 minutes after the *Miranda* advisement, Ha gave the form to appellant to read. Morales asked Ha to explain what the form was, to ask appellant if he would give consent to search his home, and to explain to appellant to sign the form if he gave consent. It took Ha perhaps a minute to translate Morales's request regarding the form. Morales saw appellant look at the form but Morales did not know whether appellant read English. Appellant said it was okay to search his home and, at 4:51 p.m., he signed the form.[2] The questioning of appellant, including the signing of the form, took perhaps 15 minutes.

After appellant consented to the search of the front house, deputies entered it and found what appeared to be more than $10,000 in a bedroom. Morales suspended the search and, based on the previous events, prepared a search warrant for the front house.

---

[2] During recross-examination of Morales at trial, appellant played a video (defense exh. A) depicting appellant sitting on a fence with his hands handcuffed. After reviewing the video, Morales conceded appellant had to have been handcuffed by 4:04 p.m., and 4:04 p.m. was not after the time he had signed the consent to search form. We note Morales did not then testify whether the handcuffs were removed at the scene sometime after 4:04 p.m.

6

Before Morales obtained this second warrant, appellant was arrested and handcuffed. Morales searched appellant incident to his arrest and found in appellant's pocket, inter alia, keys to the rear house. Morales obtained the second warrant and executed it. Deputies found inside the front house various items discussed in the Factual Summary.

Ha testified as follows. Ha was a county certified translator of Cantonese. When Ha contacted appellant, appellant was sitting in the back of a marked patrol car. Appellant was calm. Ha was certain appellant was not handcuffed. Ha had no difficulty communicating with appellant in Cantonese. Ha read appellant his *Miranda* rights in English, then translated them into Cantonese. Ha obtained a response from appellant to each question. Appellant agreed to speak with Morales and Ha.

Ha read the consent to search form to appellant in English, then translated in Cantonese. Appellant had no questions once Ha translated the form. Ha indicated to appellant to sign the form if appellant agreed to it. Ha asked appellant if appellant would be willing to give his consent to search. Appellant replied he had nothing to hide and appellant gave his consent. Ha was certain appellant was not handcuffed when he signed the form, because appellant's hands were free when he signed.[3] Ha never indicated to appellant he had a right to refuse to consent to search.

In defense, appellant, through a court interpreter, testified at the hearing as follows. Appellant spoke Cantonese and a dialect called Hakka. Appellant answered the door and two deputies were there. One had a gun and the other had a long-barreled gun. Appellant was afraid. Appellant exited the house, deputies asked him something, but appellant did not understand what they were saying. Appellant said yes and was asked to sign a document. Appellant signed it, deputies searched him, then deputies handcuffed

---

[3]    During cross-examination, appellant showed Ha a video (defense Exh. A1), depicting appellant handcuffed at a time appellant's counsel represented was 4:04 p.m. Ha testified that based on the video it was "possible" appellant was handcuffed when Ha arrived.

7

him and further searched him at the door. The deputies spoke in English and appellant did not understand them.

Deputies asked appellant to sit nearby and he sat 10 minutes. Deputies already had entered appellant's house. Appellant saw a few deputies around. Appellant was seated in the patrol car and remained there about 15 minutes until Ha arrived. Ha told appellant to exit the car. Appellant did not understand Ha's *Miranda* advisements. Ha talked with appellant 10 to 20 minutes and, during that time, appellant was afraid. Appellant believed he had to answer the questions and did not understand various terms on the consent to search form. Appellant denied remembering Ha reading the form in English and translating it to Cantonese.

Appellant had been in the United States about 32 years. As of April 28, 2009, he had owned a carpeting business for 10 years. Appellant paid business taxes and advertised. Appellant's customers were Chinese; appellant had few, if any, English-speaking customers. Gerald Young, the court interpreter during the suppression hearing, testified the translation of legal concepts into Cantonese could result in ambiguity or contradiction.

b. *Pertinent Proceedings.*

On March 5, 2010, appellant moved, inter alia, to traverse the search warrant for the front house and to suppress evidence pursuant to Penal Code section 1538.5. Evidentiary hearings occurred in October and November 2011. At the November 14, 2011 pretrial hearing on the motions, the court indicated as follows. Appellant's position he spoke virtually no English was inconsistent with the fact he had been a businessman for decades and dealt with a mixed population of customers. His position was not credible.

The court stated, "With respect to what I'm terming the consent search in the first instance, the officers said that it was a protective sweep. So we have both a protective sweep and consent in which the officers indicated that Mr. Ho said 'Go ahead. You won't find anything.' " The court indicated appellant's statement was inconsistent with

8

him "having no language ability." The court observed video indicated appellant was handcuffed during the protective sweep but testimony indicated he was not handcuffed thereafter and he was placed in a patrol car to await an interpreter. The fact officers were "waiting for a signed consent" and continued to detain appellant pending the arrival of an interpreter did not render the consent invalid. The court impliedly ruled appellant's consent to search was valid. The court denied appellant's motions.[4]

On June 6, 2012, appellant filed a motion in limine asking the court to find his statements to Morales involuntary under the Fifth and Fourteenth Amendments. At the June 12, 2012 Evidence Code section 402 admissibility hearing on the motion, the prosecutor stated, "I don't think I have witnesses here. I don't intend to introduce any of the statements." The court then stated, "Let's talk about them generally without a ruling."[5] The court expressed its tentative concerns.[6]

---

[4] In February 2012, the court declared a mistrial with the parties' consent. During subsequent proceedings, appellant filed various motions in limine.

[5] The above court was the same court that (1) ruled on November 14, 2011, appellant's consent to search the front house was valid, (2) reiterated that ruling on June 13, 2012 (as discussed *post*), and (3) presided at trial.

[6] The court and parties relied on the testimony of Morales and appellant at the November 14, 2011 Penal Code section 1538.5 hearing to discuss at the Evidence Code section 402 hearing the issue of the voluntariness of appellant's statements. At the section 402 hearing, the court stated its "concern" with the statements was the natures of the translation and detention. The court stated the video "seemed to suggest" "[appellant] handcuffed and in a car and then out of a car" during the search and before Ha arrived. The court then stated, "So I guess I have concern about the voluntariness of the statements and about the accurate translation in terms of the dialect arguments." The court told the parties to "take all the time you need" to argue the issue. Appellant argued there were translation problems. The court accepted that as true but said, "There still has to be a way to give the defendants their *Miranda* rights." The court noted Ha thought appellant understood him. The court also stated its "concern" was not the *Miranda* warnings but the nature of how the statement occurred. The court also stated it was "just not sure" how the statement was voluntary, with or without a *Miranda* warning. The court indicated Ha could further testify on the translation issue, and there was "confusion" concerning when appellant was handcuffed. The court observed that, in fairness, the deputies were focusing on the search. The court indicated the issues of the

9

The prosecutor indicated that, even before earlier trial court rulings on other admissibility issues, "the People were inclined to exclude the statements completely." The following then occurred: "The Court: Out of an abundance of caution? [¶] [The Prosecutor]: Yes; and also to save some time in terms of what would be required to put on the statements. [¶] In light of that, the People will go ahead and submit on the issue for the statements. If the court wants to exclude the statements by both defendants, People are okay with that." [¶] The Court: Both defendants' statements are excluded."

The next day, on June 13, 2012, appellant argued that, just as he had argued on June 12, 2012, appellant's statement was involuntary, so too appellant's consent to search the front house was involuntary; therefore, the cash found in the front house should be suppressed. The court rejected the argument, observing the court previously found appellant gave knowing consent to search.[7]

On June 19, 2012, at trial, Morales testified as follows. Morales wrote a probable cause determination declaration (declaration). Morales did not sign it. Morales's partner signed it when Morales and his partner presented it to the watch commander. When

*Miranda* warnings and whether they were understood could be revisited. The court also indicated it "wasn't as concerned" about the detention until the court saw the video indicating appellant had been handcuffed for a period and Morales had not recalled this.

[7] The court stated, "I think the consent is a different matter from the statements that [appellant] made. They were much more complicated; the translating of his statements was much more complicated; the coercion after the period of time that had passed; all of that together, I don't think the circumstances with respect to the statements . . . are at all the same as his consent to enter the house. I found that and still believe that that was a knowing consent and that there was not the coercion that was involved much, much later with respect to the statements."

On July 18, 2012, appellant moved for a new trial on the ground the consent to search the front house was invalid. Appellant argued a finding of consent was inconsistent with the trial court's alleged finding on June 12, 2012, appellant's statements to Morales were involuntary. The court stated, "By way of explanation, I think there was some time that passed between the consent and the statement actually being given. That was one of the reasons for the finding that the consent was voluntary but that the statement, by the time it was given, was not."

10

appellant asked Morales if there was any "indication that somebody was acting as [Morales's] agent or authorized to sign [Morales's] name," Morales indicated his partner was standing next to Morales when his partner signed the declaration. Nothing on the declaration indicated someone other than Morales had signed it.

On June 21, 2012, appellant indicated he wanted to "revisit the 1538.5" because Morales's partner, not Morales, signed the declaration. The court declined to revisit the issue. We present additional facts below.

b. *Analysis.*

Appellant claims the trial court erroneously denied his Penal Code section 1538.5 suppression motion. Appellant makes four arguments. First, appellant argues the *keys* obtained during the search of his person incident to his arrest must be suppressed because the probable cause for that arrest was the product of his *involuntary statements* to Morales. We reject that argument.

At the outset, we note that, although the trial court at the June 12, 2012 Evidence Code section 402 hearing excluded appellant's statements to Morales, it is not clear the trial court did so because they were involuntary. The trial court's comments during the hearing reflect the court initially wanted to discuss the voluntariness issue without making a ruling, and the court's subsequent comments reflected a willingness to receive further testimony on the issue of voluntariness (see fn. 6, *ante*). The trial court did not on that date expressly find the statements were involuntary.

On the other hand, the record is clear the trial court excluded the statements only after the prosecutor indicated (1) she had not intended to introduce them in the first place, (2) out of an abundance of *caution*, the prosecutor had been "inclined to exclude the statements completely," and (3) in order to save time, the prosecutor was not going to introduce them. In other words, it appears that, on June 12, 2012, the trial court, following the prosecutor's lead, excluded the statements (1) because the prosecutor indicated she was not going to introduce them, (2) for the sake of judicial economy, and

11

(3) out of an abundance of caution they were involuntary, without ruling they were involuntary.

The burden is on appellant to demonstrate error; it will not be presumed. (*In re Kathy P.* (1979) 25 Cal.3d 91, 102; *People v. Garcia* (1987) 195 Cal.App.3d 191, 198.) Appellant has failed to demonstrate the trial court ruled on June 12, 2012, appellant's statements were involuntary.[8]

Even if appellant's statements to Morales were involuntary and the keys recovered from appellant should have been suppressed, reversal is not required. There is no dispute appellant owned the front and rear houses. Appellant does not challenge the sufficiency of the evidence he was cultivating marijuana in the upper unit of the rear house (count 2). Whether or not the keys found on appellant's person should have been suppressed, deputies found, on the kitchen table in the front house, keys to the security doors of the upper and lower units of the rear house. In light of these facts and those set forth in the Factual Summary, the admission into evidence at trial of the keys recovered from appellant's person was harmless beyond a reasonable doubt. (Cf. *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

Appellant's second argument is the evidence obtained during execution of the search warrant for the front house should have been suppressed because the warrant was based on appellant's involuntary statements. We reject that argument because appellant has failed to demonstrate the trial court concluded the statements were involuntary.

Moreover, even if appellant's statements were involuntary, Morales testified appellant made his statements, then consented to the search of the front house, and Morales subsequently executed the search warrant for the front house. The trial court

---

[8]    We realize the trial court, on June 13, 2012, and July 18, 2012, made comments indicating appellant's statements were coerced (i.e., involuntary). However, the court made no such comments on June 12, 2012, when the court excluded the statements. Moreover, on June 13, 2012 and July 18, 2012, the issue the trial court was considering was whether it correctly had ruled on November 14, 2011, that appellant's consent to search was valid, not whether appellant's statements were voluntary.

12

found a different sequence of events but it found the consent to search was valid, and we uphold that finding *post*. There is therefore no need to suppress the evidence obtained during the execution of the warrant for the front house on the ground that warrant was invalid, because Morales previously had obtained valid consent to search the front house. That evidence inevitably would have been discovered during the consensual search. (See *People v. Robles* (2000) 23 Cal.4th 789, 800-801, fn. 7; *In re Javier A.* (1984) 159 Cal.App.3d 913, 928.)

Appellant's third argument is the evidence obtained as a result of his consent to search should have been suppressed because the consent was involuntary. As indicated, we reject that argument. The trial court ruled on November 14, 2011, appellant's consent to search was valid. When reviewing the denial of a defendant's Penal Code section 1538.5 suppression motion, we defer to the trial court's express and implied factual findings to the extent they are supported by substantial evidence, and exercise our independent judgment as to whether a search or seizure was reasonable under the Fourth Amendment based on the facts so found. (*People v. Glaser* (1995) 11 Cal.4th 354, 362; *Leyba, supra*, 29 Cal.3d at pp. 596-597.)

Appellant argues "every aspect of appellant's consent [to search the front house] occurred *during or after* all of his involuntary statements had been given." (Italics added.) That is, *appellant's argument* relies on the *People's* evidence as to the sequence of the events; in particular, that consent to search followed the statements.

However, to the extent appellant relies on the People's evidence, there was substantial evidence as follows. When appellant answered the door, deputies' weapons were drawn but not pointed at appellant. Appellant was perhaps a little nervous but was cooperative. Morales testified no guns were drawn on appellant when his consent to search the front house was obtained after Morales interviewed him. Appellant's consent to search was not as a matter of law invalid solely because deputies originally drew guns when confronting appellant. (*People v. Ratliff* (1986) 41 Cal.3d 675, 686.)

13

Appellant complied with Morales's request appellant step outside, and appellant was not then handcuffed. Shortly after appellant complied, Morales determined appellant needed an interpreter and summoned one. Appellant was subsequently detained, but appellant does not challenge the lawfulness of either his initial or continued detention. The approximate one-minute protective sweep of the front house occurred while appellant was being detained pending the arrival of Ha. Morales testified appellant was not handcuffed when appellant was placed in the patrol car. Appellant and the deputies waited "probably about maybe 25 minutes" for an interpreter. Appellant remained unhandcuffed during the interview. The questioning of appellant took perhaps 15 minutes.

Ha testified appellant was calm and Ha had no difficulty communicating with appellant. Ha advised appellant of his *Miranda* rights and appellant agreed to speak with Morales and Ha. We have recited appellant's statements to Morales; nothing about them indicates Morales or Ha coerced appellant when he made them. When, after the interview, Ha asked appellant if he would be willing to give consent to search, appellant said he had nothing to hide and gave consent. In sum, assuming consent to search followed appellant's statements, we conclude, contrary to appellant's argument, the People's evidence provided substantial evidence appellant's consent to search was valid.

Of course, appellant's testimony suggested, and the trial court's November 14, 2011 reasoning and ruling implied, appellant orally consented to the search shortly after he encountered deputies at his door. We previously set forth the trial court's November 14, 2011 reasoning and ruling. Whether the consent to search was before or after the alleged involuntary statements, we agree with the trial court appellant's consent to search the front house was valid.

Appellant's fourth argument is the search warrant for the front house was void because, according to appellant, Morales's partner forged Morales's signature on the warrant, affidavit, and/or statement of probable cause. We reject the argument. Pursuant to appellant's request, this court, on October 31, 2013, took judicial notice of a two-page

14

document. Page 1 purports to be a copy of only the first page of a search warrant (warrant) signed by an issuing magistrate, and an affidavit signed by Morales. Page 2 purports to be a copy of a declaration. It appears page 2 is a copy of the declaration concerning which Morales testified as discussed previously.

We assume without deciding the above warrant and affidavit commanded the search of the front house, and the declaration supported, and was attached to, the warrant and affidavit. Appellant cites no case holding the mere fact an affiant's partner, and not the affiant, signed the *declaration* renders void a search warrant. There is no dispute Morales signed the *affidavit*. In it, Morales "swears under oath that the facts expressed by him . . . in this Search Warrant and Affidavit and the attached and incorporated statement of probable cause are true." There is no dispute the magistrate signed the *warrant*. In it, the magistrate states, "proof by affidavit having been made before me by Deputy Joe Morales," the magistrate was commanding the search.

"The test of the sufficiency of an officer's oath in support of a search warrant is whether he can be prosecuted for perjury should his statement of probable cause prove false." (*People v. Hale* (2005) 133 Cal.App.4th 942, 947 (*Hale*).) Even if Morales did not sign the declaration, he wrote it. Given his affidavit, which incorporated the declaration, he would have been liable for perjury had the declaration not been true. Morales indicated his partner signed Morales's name in his presence. There was no intent to defraud and, therefore, no forgery; Morales authorized his partner to sign for Morales. The fact Morales signed the declaration did not invalidate the warrant. (Cf. *Hale*, at pp. 946-947; but see *People v. Leonard* (1996) 50 Cal.App.4th 878.)

2. *The Evidence of the Money in the Front House Was Admissible*.

Appellant objected in the trial court to the introduction into evidence of the money found in the front house on the ground the evidence was irrelevant and excludable under Evidence Code section 352. The trial court overruled the objections. The court also stated, "it goes to weight in terms of the explanation for its being there."

15

Appellant claims the trial court erred. We disagree. We review for abuse of discretion any claim a trial court erred in its rulings on relevance and/or Evidence Code section 352 objections. (*People v. Waidla* (2000) 22 Cal.4th 690, 717, 723-724.) In Part 3 of our Discussion below, we discuss the money in the context of the rest of the evidence in this case. That discussion reveals when the money is considered with the rest of the evidence in this case, the money had a tendency in reason to prove, as proceeds of marijuana cultivation and sales activity, appellant committed the offenses of which he was convicted, and was admissible. The trial court did not abuse its discretion by failing to exclude the evidence of the money.

3. *Sufficient Evidence Supported Appellant's Convictions on Counts 1 and 3.*

    a. *Sufficient Evidence Supported Appellant's Conviction on Count 1.*

Appellant claims there is insufficient evidence supporting his conviction on count 1 because there is insufficient evidence he had the purpose of unlawfully manufacturing a controlled substance "for sale or distribution" within the meaning of Health and Safety Code section 11366.5, subdivision (a). Appellant argues, inter alia, "it was entirely possible for appellant to have known that marijuana was being grown, but to have no knowledge of the *scope* of the operation or what was being done with that marijuana." (Italics added.) We reject appellant's claim.

There is no dispute appellant cultivated marijuana, the crime of which he was convicted in count 2. Moreover, there was substantial evidence as follows. Appellant owned and had access to the rear house's upper unit in which 968 marijuana plants were being cultivated. They were in different stages of growth, i.e., some had been growing for some time while appellant had access to the rear unit.

On April 28, 2009, Morales saw appellant twice walk towards the rear house. Morales could smell a slight odor of marijuana outside the door of the upper unit. When Morales opened the door to the upper unit, the marijuana odor was overwhelming. Appellant's safe in the front house contained $20,040, mostly in $100 bills. Appellant hid $17,350 in shoes; this concealment was evidence of consciousness of guilt. There

16

was $447 in the open on a dining room table. When considering the above money with the rest of the evidence in this case, the jury reasonably could have concluded some or all of that money represented proceeds from the sale of marijuana cultivated in the rear house. We note some of the marijuana in the rear house already had been harvested; the jury reasonably could have concluded the harvested marijuana recently had been sold.

If appellant had purposed to unlawfully manufacture marijuana but not for sale or distribution, the jury reasonably could have expected appellant to call Thanh, Junjie, and/or Cu Cuu Ho to so testify. (See *People v. Ford* (1988) 45 Cal.3d 431, 432-433, 435-436.) Appellant concedes the People's experts opined "the scale of the operation was such that it could not be for personal use." Appellant's claim fails.

b. *Sufficient Evidence Supported Appellant's Conviction on Count 3.*

Appellant claims there is insufficient evidence supporting his conviction for theft of utility services (count 3). Appellant argues, inter alia, "With respect to Count 3, appellant's mere knowledge of the marijuana operation and his allowing the residence to be used for that purpose could not have established that he specifically aided and abetted the installation of a bypass and theft of electricity within that residence." We reject appellant's claim. In light of our discussion above, we conclude there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, appellant, as a direct perpetrator or as an aider and abettor, committed theft of utility services worth more than $400. (*Ochoa, supra,* 6 Cal.4th at p. 1206.)

4. *The Trial Court's Instruction on Count 1 Was Proper.*

Appellant claims the trial court erroneously instructed on count 1.[9] He argues in essence the court's instruction on the elements of that count erroneously told the jury

---

[9] The instruction stated, "Defendant Jack Duc Ho is charged in Count 1 with Allowing Place for Preparing or Storing Controlled Substance in violation of Health & Safety Code section 11366.5(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] (1) The defendant had under his management or control any building, room, space, or enclosure, either as an owner, lessee, agent, employee, or mortgagee; [¶] (2) The defendant knowingly and with specific intent rented, leased, or made available that building, room, space, or enclosure *for the purpose of unlawfully*

17

appellant had to commit the acts required by Health and Safety Code section 11366.5, subdivision (a) "for the purpose of unlawfully manufacturing . . . any controlled substance" instead of telling the jury he had to commit them "for the purpose of unlawfully manufacturing . . . any controlled substance *for sale or distribution*." (Italics added.) We reject appellant's claim.

First, like the court's instruction in this case, Health and Safety Code section 11366.5, subdivision (a), contains the phrase, "for the purpose of unlawfully manufacturing, storing, or distributing any controlled substance for sale or distribution." Since ". . . 'for sale or distribution' [in subdivision (a)] modifies the phrase 'controlled substance,' it applies equally to all three prohibited activities, including manufacturing." (*People v. Costa* (1991) 1 Cal.App.4th 1201, 1206.) The court's instruction was therefore correct.

Second, although the court might have clarified the instruction to refer to "the purpose of unlawfully manufacturing any controlled substance for sale or distribution" (i.e., omitting from that phrase references to storing or distributing), the instruction correctly stated the law and was responsive to the evidence; therefore, appellant waived the clarification issue by failing to request clarification below. (Cf. *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156.) Finally, in light of part 3 of our Discussion, there was not only sufficient but ample evidence appellant harbored the purpose of unlawfully manufacturing marijuana for sale or distribution. Any trial court error in failing to clarify the instruction at issue was not prejudicial. (*People v. Andrews* (1989) 49 Cal.3d 200, 215.)[10]

---

*manufacturing*, storing, or distributing any controlled substance *for sale or distribution*; AND [¶] (3) Defendant did so with or without compensation. (Italics added.)

[10] In light of the above, we reject appellant's claim cumulative prejudicial error occurred.

5. *Penal Code Section 654 Barred Punishment on Count 3 But Not on Count 2.*

Appellant claims Penal Code section 654 barred punishment except on count 1. We disagree. There was substantial evidence appellant cultivated *and harvested* some of the marijuana (count 2), and removed the harvested marijuana from one of the six rooms in the upper unit of the rear house. However, *even after that*, appellant continued making available the upper unit of the rear house for the manufacture of marijuana (count 1) and continued stealing utility services (count 3). Penal Code section 654 did not bar punishment on count 2, since appellant had independent criminal objectives as to counts 1 and 2, and as to counts 2 and 3. (Cf. *People v. Goodall* (1982) 131 Cal.App.3d 129, 147.)

On the other hand, appellant stole electricity (count 3) for no purpose other than to make available the upper unit of the rear house for the manufacture of marijuana (count 1). Penal Code section 654 barred multiple punishment on counts 1 and 3, since appellant did not have independent criminal objectives as to those counts. We will modify the judgment as to count 3.

6. *The Sentencing Minute Order Must Be Corrected.*

During the July 18, 2012 sentencing hearing in this case, the trial court orally imposed the probation condition "[t]hat [appellant] not own, use, or possess any controlled substance without a prescription for the same." However, the July 18, 2012 sentencing minute order reflects a condition the trial court did not orally impose during the sentencing hearing, i.e., that appellant "not use or possess any narcotics, dangerous or restricted drugs or associated paraphernalia," except with a valid prescription.

The sentencing minute order also includes three conditions the trial court did not orally impose during the sentencing hearing, i.e., that appellant (1) "[n]ot own, use or possess any dangerous or deadly weapons, including any firearms, knives or other

19

concealable weapons," (2) "[o]bey all laws and orders of the court," and (3) "[o]bey all rules and regulations of the probation department."[11]

Appellant claims the trial court must correct the sentencing minute order by deleting the above probation conditions the court did not orally impose during the sentencing hearing. We partially agree. Except as indicated in the text below, all above probation conditions the trial court did not orally impose must be deleted from the sentencing minute order. (Cf. *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2; *People v. Mesa* (1975) 14 Cal.3d 466, 471.)

We believe the trial court's oral reference to "controlled substances" was a shorthand phrase that included "narcotics, [and] dangerous or restricted drugs" as well. (*See In re Frankie J.* (1988) 198 Cal.App.3d 1149, 1154.) There is no need to delete from the sentencing minute order the probation condition appellant not "use or possess any narcotics, [or] dangerous or restricted drugs." (See *In re Merrick V.* (2004) 122 Cal.App.4th 235, 249.) We also believe requirements a defendant "obey all laws and orders of the court" and "obey all rules and regulations of the probation department" are so basic they are implied in every grant of probation. (Cf. *People v. Thrash* (1978) 80 Cal.App.3d 898, 902; *People v. Lippner* (1933) 219 Cal. 395, 399.) There is no need to delete these from the minute order.

---

[11]     The minute order further states, "Defendant acknowledges to the court that the defendant understands and accepts all the probation conditions, and defendant agrees to abide by same." However, the reporter's transcript reflects no such acknowledgement by appellant.

## *DISPOSITION*

The judgment is modified by staying execution of sentence on appellant's conviction for theft of utility services worth more than $400 in violation of Penal Code section 498, subdivisions (b) and (d) (count 3) pending completion of his sentence on his remaining convictions, such stay then to become permanent, and, as so modified, the judgment is affirmed.  The trial court is directed to correct its July 18, 2012 sentencing minute order by deleting the phrase "or associated paraphernalia" from the probation condition in which that phrase now appears, with the result the corrected probation condition states only that appellant may "not use or possess any narcotics, [or] dangerous or restricted drugs," and by deleting from said minute order the probation condition appellant "[n]ot own, use or possess any dangerous or deadly weapons, including any firearms, knives or other concealable weapons."

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KITCHING, J.

We concur:

CROSKEY, Acting P. J.

ALDRICH, J.

21