Filed 11/25/15  P. v. Webb CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID CARLOS WEBB,<br><br>        Defendant and Appellant. | A138547<br><br>(Solano County<br>Super. Ct. No. VCR214517) |

Following a jury trial, David Carlos Webb was found guilty of two counts of robbery (Pen. Code, § 211) arising out of two separate incidents.  The jury also found true enhancement allegations that both robberies involved the use of firearms.  Defendant contends his trial counsel provided ineffective assistance in failing to present expert testimony regarding the reliability of eyewitness identification and in failing to move to exclude identification testimony by one of the robbery victims.  He also argues that the trial court misinstructed the jury regarding eyewitness identification and the prosecutor improperly vouched for the credibility of his witnesses.  We find no error and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

*The March 24, 2012, Incident*

On March 24, 2012, at around 2:00 a.m., Teri Mitchell was returning to her car in the parking lot of Kaiser Hospital in Vallejo after taking her father-in-law to the emergency room.  As she stood by the open rear door, looking in her purse for her cell phone, she heard footsteps rapidly approaching behind her.  She turned and saw a man,

later identified as defendant, holding a gun in his left hand and running towards her. The gun was rectangular and pointed in her direction. When defendant reached her, Mitchell kicked him. Defendant shoved Mitchell back against the car and she fell onto the back seat. Defendant jumped on top of her and shoved the gun into her right side several times. Defendant did not say anything, but he thrust his face towards her face, which she perceived to be a way of intimidating her so she would stop fighting back. Mitchell was looking into defendant's face while he was on top of her; she was able to get a good look at him. Defendant grabbed her purse, waved it at her, jammed the gun into her side again, and then ran off. Mitchell screamed and ran back into the emergency room.

Officer Sean Kenney arrived about five minutes later. Mitchell was extremely upset, shaking, and had difficulty talking. Mitchell described her assailant as an average-sized African-American man with light-colored skin, wearing a sweatshirt with a hood up. The hood covered his ears, neck, and part of his mouth. Mitchell was able to see his forehead, eyes, nose, cheeks, and his mustache. She was not able to see his hair or hairline. Officer Kenney did not try to retrieve any fingerprints from her car because he did not think it likely he would find any based on Mitchell's description of the incident.

A week or two later, Mitchell picked defendant out of a photographic lineup. She took her time and made sure she was positive before selecting his photograph. Mitchell identified defendant at the preliminary hearing. She was even more certain this time that defendant was the robber, seeing him in person as opposed to a photograph. Mitchell also identified defendant at trial, testifying "It's just a face you don't forget when they're on top of you." Mitchell acknowledged that the robbery was a traumatizing experience, but denied that the emotional turmoil affected her ability to see and recognize her assailant.

*The April 7, 2012, Incident*

In April 2012, Joaquin Raya was in the business of selling medical marijuana. He advertised his product on various websites. Raya received a text message from an individual, later identified as defendant, interested in buying some marijuana. Defendant agreed to buy four ounces, which Raya offered to sell for $800-$900. Defendant gave

2

Raya the first and last name, identification number, and birth date of a registered medical marijuana user named La John Hutchins, using this information as his own. Defendant and Raya also had three or four telephone conversations. They made a plan to meet at defendant's apartment complex in Vallejo.

On April 7, 2012, Raya drove to the agreed-upon location with about four ounces of marijuana. Raya also had "a couple thousand" dollars in cash with him. Raya called defendant when he arrived and defendant walked out to the front of the complex to meet him. Raya and defendant remained on the phone as defendant walked outside. Raya described defendant's voice as "[s]oft, feminine." Defendant had a companion with him. Defendant declined Raya's request to come out to his car; Raya got out of the car and walked to the entrance of the complex. Defendant wanted to see the product, so the three men walked into the complex. Defendant and his companion told Raya they had been robbed and wanted to be sure Raya was not armed. All three men pulled up their shirts to show they had no weapons in their waistbands.

Raya started to get a bad feeling about the two because they were acting "really scared, sketchy, like nervous." Defendant wanted to go to his apartment, but Raya refused and insisted that they complete the transaction outside. Defendant and the other man wanted to check Raya's backpack to see the marijuana and make sure he did not have a gun. After looking inside the backpack, defendant grabbed it out of Raya's hand. Defendant's companion pulled out a gun and told Raya to "get out of there, walk the other way." Raya left and called the police.

Raya spoke with police officers who responded to the scene. He gave them defendant's phone number, the name and medical marijuana number defendant had given him, and a description of defendant and his companion. Raya testified that, at the time of the robbery, defendant's head was not covered in any way and he had a short Afro, not the bald head he had at trial. Defendant also had a mustache.

About one week later, Officer Steven Cheatham became involved with investigating the April 7 robbery. Cheatham showed Raya six photographs, one by one, that were numbered one to six, and asked Raya whether he recognized anyone from his

3

robbery. Cheatham testified that he put down photo number one, and Raya looked at it. Then he put down photo number two, and Raya looked at it as well. As Cheatham was putting down photo number three, which was defendant's photo, Raya immediately told him this was the person that robbed him. Raya reacted "[e]xtremely quickly" in identifying the photo; the officer had not even finished putting the photograph down. Raya said he was positive that was the robber, and wrote "[t]his is the guy that robbed me" on the photo.

Officer Cheatham explained at trial that defendant's photo was used in the lineup presented to Raya because of an incident that occurred a week later, on April 13. The other five photographs were pulled from the Solano County booking system and were chosen because they all appeared similar to each other.

*The April 13, 2012, Undercover Operation*

The same person who made the original contact with Raya to purchase medical marijuana on April 7 subsequently texted him again, this time in response to a new on-line ad put up by Raya the day after he was robbed. Raya responded to the text message, but did not let on that he was the victim from the earlier incident. Raya gave this information and the person's telephone number to the Vallejo police. Officer Fabio Rodriguez, posing as a marijuana distributor, called the phone number and spoke with defendant, who again identified himself as La John Hutchins. In a series of six or seven phone calls, Rodriguez set up a meeting with defendant to sell marijuana. Rodriguez spoke with the same person on the phone each time; the person had a somewhat feminine voice. The person wanted to meet at an apartment complex about a block and a half away from the complex where Raya was robbed and within two miles of Kaiser Hospital where Mitchell had been robbed a few weeks earlier.

Vallejo Police Department Sergeant Kevin Coelho supervised the operation, with the goal of apprehending defendant. Coelho chose a nearby church parking lot as the safest place to attempt the arrest in case shots were fired. The meeting was planned for 2:00 or 3:00 in the afternoon; it was considered an "extremely high-risk" operation.

4

Detective Jason Potts, posing as a marijuana dealer, spoke with defendant and negotiated a price to sell 20 ounces of marijuana. Potts noticed that the voice of the person he spoke with was polite and had an almost feminine tone. On April 13, after finally persuading defendant to meet in the church parking lot, Potts parked there in an undercover vehicle. Several minutes later, Potts saw defendant walking across the lot. Potts called the phone number again to see defendant answer the phone. Instead of answering, defendant patted his pants, and he and Potts exchanged waves. At this point, Potts recognized defendant based on prior contacts, thinking to himself, "Oh, that's David Webb," as soon as defendant waved at him. Potts called dispatch during the incident and asked for a photo of David Webb.

At that point, with defendant less than 40 feet away, Potts made the bust signal and threw a flash bang device. Defendant fell to the ground and then got up and ran. Sergeant Coelho and Detective Kent Tribble had been monitoring the situation from a van nearby; the van accelerated toward Potts and defendant. Coelho saw Potts and defendant running. Defendant was wearing a white jacket and dark jeans. Potts had started to give chase, but turned around when he realized that he had left a loaded firearm in his vehicle and other officers were chasing defendant. At that moment, defendant reached into his waistband area and looked at Potts over his shoulder. From about 15 feet away, officers saw defendant digging in his pocket for something as he ran. Detective Tribble thought defendant was reaching for a firearm and shouted, "He's got a gun. He's getting a gun." Tribble then saw the rear portion of the gun defendant was attempting to remove. Sergeant Coelho saw defendant move his left hand to the left side of his waistband and remove a gun with his right hand from the waistband. Both Coelho and Tribble fired at defendant to protect Potts. Defendant ran up the stairs into the apartment complex next to the church. Coelho did not shoot again because defendant was no longer an immediate threat. Defendant was able to run past the perimeter officers and escape immediate apprehension.

The day after the failed undercover operation, Detective Tribble conducted a follow-up investigation at the apartment complex and found a white jacket that looked

5

like the one defendant had been wearing. The jacket had bullet entry and exit holes in the upper portion of the left sleeve. Tribble viewed a hospital photograph of an African-American man with an exit wound in the left shoulder that was consistent with the location of the hole in the jacket. Tribble identified defendant as the person in the photograph.

On April 15, 2012, Officer Mathew Mustard interviewed defendant at the Solano County Jail. Defendant had a gunshot wound to his left shoulder and did not deny that he had been shot by police on April 13.

Officer Mustard reviewed phone records for the cell phone number involved in the Raya robbery and the undercover operation. The cell phone number was associated with defendant's name and date of birth. The cell phone records also contained evidence of communications with Raya on April 7, 2012. Text messages showed the name "La John Hutchins" when the user of the phone attempted to make purchases of marijuana.

By amended information filed on October 1, 2012, the Solano County District Attorney charged defendant with four counts. Count 1, based on the April 13 undercover operation, charged assault of a police officer with a semi-automatic firearm (Pen. Code, § 245, subd. (b)),[1] with an allegation that defendant personally used a semi-automatic firearm (§ 12022.5, subd. (a)). Count 2, also based on the April 13 undercover operation, charged unlawful firearm activity (§ 29820), with an allegation that defendant was adjudged a ward of the juvenile court in 2006 for violation of section 211 (robbery).[2] Before trial, defendant admitted the allegation as to count 2. Count 3, based on the robbery of Raya, charged second degree robbery (§ 211) with an allegation that defendant was armed with a firearm (§ 12022, subd. (a)(1)). Count 4, based on the robbery of Mitchell, charged second degree robbery (§ 211) with an allegation that defendant

---

[1] All further unspecified statutory references are to the Penal Code.

[2] As applicable here, pursuant to section 29820, it is unlawful for a person under the age of 30 to own or possess a firearm if that person was adjudged a ward of the court within the meaning of Welfare and Institutions Code section 602 for committing an offense listed in Welfare and Institutions Code section 707, subdivision (b). (§ 29820, subds. (a), (b).)

personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)). The court struck count 1 at the close of the prosecution's case. The defense called no witnesses at trial.

On October 19, 2012, the jury found defendant guilty of both robberies, counts 3 and 4, and found true the firearm allegations as to both counts. The jury deadlocked on count 2, and the court granted the prosecution's motion to dismiss it. The court denied defendant's motion for a new trial.

On March 18, 2013, the court designated count 4 the principal term and sentenced defendant to the high term of five years for the Mitchell robbery, 10 years for the section 12022.53, subdivision (b) personal use of a firearm enhancement, one third the midterm for the Raya robbery, to run consecutively, and one third the midterm for the section 12022, subdivision (a)(1) enhancement to count 3 of four months. The aggregate term imposed was 16 years, four months.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant contends two omissions by his trial counsel constituted ineffective assistance of counsel: the failure to present expert testimony regarding eyewitness identification evidence and the failure to move to exclude Mitchell's identification testimony.

" 'The law governing [ineffective assistance of counsel] is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' " [Citations.] It is defendant's burden to demonstrate the inadequacy of trial counsel. [Citation.] We have summarized defendant's burden as follows: " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the

7

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " [Citation.]' [Citation.] If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected," ' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.'[3] [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)

A.    *Failure to Present an Eyewitness Identification Expert.*

The defense in this case was mistaken identity. Counsel presented the defense in his opening statement, vigorously cross-examined victim-eyewitnesses Mitchell and Raya, and argued misidentification extensively in closing argument. The jury was instructed on eyewitness identification evidence; the trial court read every one of the applicable factors in CALCRIM No. 315. Defendant contends, however, that cross-examination was not sufficient to expose the weaknesses inherent in eyewitness evidence and his counsel's failure to present an eyewitness identification expert constituted ineffective assistance of counsel. Defendant contends that an expert witness could have testified regarding the factors affecting the reliability of such evidence, including the

---

[3] During the pendency of this appeal, defendant's appellate counsel filed a petition for habeas corpus relief in this court. The petition is also based on trial counsel's alleged ineffectiveness in failing to present expert testimony on eyewitness identification. We have denied the habeas petition (A143141) by separate order filed this day.

8

effects of fear or stress, the presence of a weapon, and cross-racial identification, and could have provided guidance to the jury in how to follow the instructions on eyewitness testimony.

Defendant does not carry his burden of affirmatively showing that counsel's representation was deficient. "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Here, there may well have been sound strategic reasons for counsel's decision not to call an expert. Defense counsel himself exposed inconsistencies in the eyewitnesses' testimony and, as defendant's brief describes it, "zealously cross-examined both eyewitness victims." Defense counsel also argued that the eyewitnesses' testimony was not credible, and he attacked eyewitness testimony generally as "one of the weakest, most unreliable bits of evidence that we put in Court here . . . ." Counsel relied on the exhaustive list of factors identified in CALCRIM No. 315 that affect the reliability of eyewitness identification testimony—including the eyewitness being under stress, lighting, and cross-racial identification—to argue that the eyewitness testimony should be disbelieved. Counsel could have concluded that these factors were within the jury's common understanding and that he could effectively argue his case without expert testimony.

Counsel also may have made the rational decision to address these issues himself and avoid the risk that cross-examination of an eyewitness identification expert might have *supported* the reliability of the eyewitness identifications in this case, particularly the evidence corroborating Raya's identification. As we have discussed, cell phone records admitted at trial established that the phone number involved in the Raya robbery and the undercover operation was associated with defendant's name and date of birth. The records showed text messages between Raya and defendant on April 7, 2012, and that defendant used the name "La John Hutchins" when arranging to buy marijuana. At trial, Detective Potts identified defendant as the individual who approached him in the church parking lot and as the "David Webb" he knew from prior contacts, including

9

having arrested him for robbery in 2009.  Expert testimony strengthening the prosecutor's case that Raya correctly identified defendant, despite the presence of whatever factors the expert identified as reducing reliability, could, in turn, undermine the defense challenge to the Mitchell identification and the benefit of presenting the expert testimony.  " 'Since the decision may well have been "an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.  [Citation.]" '  [Citation.]" (*People v. Anderson*, *supra*, 25 Cal.4th at pp. 569-570.)

B.       *Failure to Move to Exclude Eyewitness and Pre-trial Identification Testimony*.

Defendant contends his trial counsel was ineffective by not seeking to exclude Mitchell's eyewitness and pre-trial identification testimony, which defendant now contends was unreliable based on the circumstances of the robbery and an unduly suggestive photo lineup.  Defendant acknowledges that his counsel challenged the credibility of Mitchell's identification through cross-examination and closing argument, but contends counsel's failure to seek exclusion of the identification fell below an objective standard of reasonableness.

An out-of-court identification may be so unreliable that it violates a defendant's due process rights.  (*Manson v. Brathwaite* (1977) 432 U.S. 98, 107; *People v. Gordon* (1990) 50 Cal.3d 1223, 1242, overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835.)  "In order to demonstrate that the alleged incompetency of his trial counsel in not objecting to the identification evidence denied him a potentially meritorious defense, the defendant must present a convincing argument that the pretrial identification procedure 'resulted in such unfairness that it infringed his right to due process of law.'  [Citations.]  Our task is thus to assess the facts and circumstances of the identifications to determine whether they were 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'  [Citations.]" (*People v. Nation* (1980) 26 Cal.3d 169, 179.)

The initial inquiry in a due process challenge to identification evidence is whether the identification procedure was unduly suggestive and unnecessary.  (*Manson v. Brathwaite*, *supra*, 432 U.S. at pp. 104-107; *People v. Gordon*, *supra*, 50 Cal.3d at p.

10

1242.)[4]  "The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367, superseded by statute on another ground as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106, abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1185, 1193.)  Defendant's argument that the photo lineup was unduly suggestive is as follows:  "The distinctive shaved head of [defendant] in the photo line-up shown Ms. Mitchell ultimately was the equivalent of an identification procedure that 'suggests in advance of identification by the witness the identity of the person suspected by the police.' (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891.)  Singling out a suspect, which effectively occurred here when [defendant] was the only one without hair, presents the greatest danger of misidentification. (*People v. Nation*, *supra*, 26 Cal.3d at pp. 180-181.)  The sole subject with a shaved head was suggestive because Ms. Mitchell did not see the hair of her assailant.  Her subsequent identification at the preliminary hearing merely set the potential misidentification in stone . . . ."

We have examined the photographs and observe that all six photographs depict young adult African-American males.  All appear from the shoulders up and are facing forward against blank backgrounds.  All appear similar in age, weight, and build.  None has any visible jewelry, eyeglasses, or tattoos.  All are casually dressed.  Some have mustaches and some have hair on their chins.  Only defendant's head is shaved, but the other five men have very short hair.  Defendant's argument that his photograph was distinct from the others is without merit.  Mitchell made clear that she could not see the assailant's hair or hairline during the robbery, and that the hair or hairline of the photographed individuals had no effect on her selecting defendant's photo and excluding

---

[4] Because we conclude the identification procedure itself was not unduly suggestive, we do not reach the second inquiry, "whether the identification itself was nevertheless reliable under the totality of the circumstances . . . ." (*People v. Gordon*, *supra*, 50 Cal.3d at p. 1242.)  The identification is constitutionally unreliable only if the answer to the first question is yes and the second is no. (*Ibid.*, citing *Manson v. Brathwaite*, *supra*, 432 U.S. at pp. 104-107, 109-114; see also *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

the others.[5]  Nothing here caused defendant " 'to "stand out" from the others in a way that would suggest the witness should select him.' [Citation.]" (See *People v. Cunningham* (2001) 25 Cal.4th 926, 990.)  Defendant has not met his burden of establishing that the photo lineup was impermissibly suggestive.

Defendant's reliance on *People v. Nation*, *supra*, 26 Cal.3d 169 does not advance his argument.  In *Nation*, the defendant was accused of approaching three young girls and attempting to rape one of them.  Two weeks later, the victim and her two friends went to the police station to try to identify the attacker from photographs.  (*Id*. at pp. 173-174.)  The three looked at the photographs together.  One of the girls, not the victim, selected defendant's mug shot and informed the others that she had found the assailant.  After some discussion, the other two agreed.  At the time, the victim had been considering a different suspect's photograph.  The girls then took the photograph home for a week to show two other possible witnesses, including one of their mothers who reported that a man made a lewd comment to her in the vicinity of the crime later that night.  When the girls showed her defendant's photograph, she agreed it depicted the same man who had commented to her.  (*Id*. at pp. 174, 180.)  At a live lineup two months later, only the mother identified defendant; the three girls selected a different person and were told they had chosen the "wrong" man.  (*Id*. at p. 174.)  In reversing the defendant's conviction, the *Nation* court found the photographic identification procedure was so extraordinarily suggestive that it was doubtful the prosecutor could have submitted the evidence over a timely objection by defense counsel, and held that counsel's failure to object constituted ineffective assistance of counsel.  (*Id*. at pp. 174, 179-181.)  By contrast, the identification procedure here involved one witness, Mitchell, who repeatedly and

---

[5] On cross-examination, defense counsel asked Mitchell if she was able to exclude certain photos because of different facial features such as different chins, hair or eyebrows.  Mitchell answered, "No.  The other ones just didn't look anything like the person that I knew that it was."  Counsel asked Mitchell a number of questions about the assailant's hood and defendant's shaved head in the photo.  Mitchell testified consistently that she could not see any hair on defendant's head and did not know whether he had any hair because of the hood.

12

consistently identified defendant both in a photograph and in person, with none of the suggestive and unreliable circumstances present in *Nation*.

We also understand defendant to argue that defense counsel should have sought to exclude Mitchell's in-court identification of defendant because it was "derived from [an] unreliable and potentially suggestive" pretrial identification, and thus resulted in "an additional and separate denial of due process." Having concluded that the pretrial identification procedure here was not unduly suggestive, we necessarily reject this contention.

C.    *Instructional Error.*

Defendant contends his rights to due process and a fair trial were violated by the court's instruction pursuant to CALCRIM No. 315 that the jury could consider the witness's level of certainty as one of many factors in evaluating the eyewitness identification testimony.[6] At trial, both Mitchell and Raya testified that they were positive of their identification of defendant, and the prosecutor emphasized their certainty

---

[6] The trial court instructed the jury with CALCRIM No. 315 in its entirety, which provides: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? How well could the witness see the perpetrator? What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? Did the witness give a description and how does that description compare to the defendant? How much time passed between the event and the time when the witness identified the defendant? Was the witness asked to pick the perpetrator out of a group? Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? *How certain was the witness when he or she made an identification?* Are the witness and the defendant of different races? Was the witness able to identify the defendant in a photographic or physical lineup? Were there other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the[se] crime[s]. If the People have not met this burden, you must find the defendant not guilty." (Emphasis added.)

13

in his closing argument. Citing research and cases from other states on the reliability of eyewitness identification, defendant argues that there is no established correlation between a witness's certainty and the accuracy of that identification and jurors do not generally understand that eyewitness confidence is not a reliable predictor of accuracy. "To the extent that CALCRIM No. 315 perpetuates this myth," defendant contends, the instruction "is erroneous."

As an initial matter, we address the Attorney General's contention that defendant forfeited any claim of error by failing to object or request modification of this instruction in the trial court. Pursuant to section 1259, we may review any claim of instructional error that affects a defendant's substantial rights, without regard to whether an objection was made below. "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim . . . ." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) We will, therefore, address defendant's contention, but conclude it has no merit.

In *People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*), the Supreme Court expressly approved a version of CALJIC No. 2.92, the predecessor to CALCRIM No. 315, that told the jury to consider the degree of certainty in assessing the reliability of eyewitness identification evidence.[7] (Accord, *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232 (*Johnson*), superseded by statute on another ground as noted in *Verdin v. Superior Court, supra,* 43 Cal.4th at p. 1106.) "We hold that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should *not* take a position as to the *impact* of each of the psychological factors listed." (*Wright, supra,* 45 Cal.3d at p. 1141.) Further, "the listing of factors to be considered by the jury will sufficiently bring to the jury's attention the appropriate factors, and . . . an

---

[7] CALJIC No. 2.92 instructs the jury to consider 13 enumerated factors including "[t]he extent to which the witness is either certain or uncertain of the identification."

explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*Id*. at p. 1143.)

The certainty factor in CALCRIM No. 315 is indistinguishable in substance from that set forth in CALJIC No. 2.92 and approved in *Wright* and *Johnson*. Notwithstanding defendant's claim that courts in other states have rejected witness certainty as a valid factor for a jury to consider in deciding the reliability of eyewitness identification testimony, we are bound by California Supreme Court precedent, and thus find no error. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

D.     *Prosecutorial Misconduct*.

Finally, defendant contends the prosecutor engaged in misconduct during closing arguments when he impermissibly vouched for the credibility of two of the witnesses, Mitchell and Raya.

In closing, the prosecutor argued: "What we do want is, we want credible testimony from people about what they observed, so you could imagine that when someone goes through an event like Ms. Mitchell went through, she's not keeping track of time; she's not making measure of distances, but when she's got that person laying [sic] on top of her face-to-face, inches away, jamming a gun into her side, that face is burned into her memory.

"And she sat here in front of you and she pointed to the defendant, I don't know how many times, I don't know how many different ways, and said, 'I don't have any doubt that that is the person that robbed me at gunpoint on that day,' that's the way you want your system to work, so someone like that can get justice.

"Let's talk about the sort of person that you would have to believe Ms. Mitchell to be in order for her to say those sort of things under oath and not really know it for sure. She understands, and I hope you remember this little line of questioning that I tried to go through with each Ms. Mitchell and Mr. Raya, about whether or not they understood just generally the consequences of someone being identified as a robber being brought to trial and that sort of thing.

15

"The point of that was very specific, and that is that it would take an evil, horrible person to sit up there on the witness stand, knowing generally what's at stake in this sort of situation, and without being a hundred percent sure, even though they're testifying that they're a hundred percent sure, point to him and say, 'He's the one that robbed me.' That would take a soulless, horrible person, and whatever evidence you have in this case, there is no evidence, or none reasonably, that Ms. Mitchell is that sort of human being that would do that to Mr. Webb, (indicating), unless she was sure.

"She wasn't so angry about what happened that she wanted to have someone held responsible. She saw him do it, and she told you about it, and you should convict him on it. It's as simple as that, if the system works.

"The same thing is true for Mr. Raya. . . ."

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; see *People v. Cash* (2002) 28 Cal.4th 703, 733.) 'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' (*Ibid.*) When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' (*People v. Smithey* (1999) 20 Cal.4th 936, 960, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

Defendant did not object to the prosecutor's statements and did not request that the jury be admonished, and he has, therefore, forfeited these claims on appeal. (See *People v. Alfaro*, *supra*, 41 Cal.4th at p. 1328.) Attempting to avoid this result, defendant first

contends the issue is preserved because he raised it in his motion for new trial. However, such argument was not itself timely.[8] "It is well settled that making a timely and specific objection *at trial*, and requesting that the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal. [Citations.] 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328, emphasis added.)

Second, defendant contends an admonition would not have cured the harm caused by the misconduct. The record does not support this argument. Shortly before the portion of the argument defendant is now challenging, defense counsel objected on a different ground, and his objection was sustained. Shortly after the now-challenged remarks, defense counsel again raised an objection. After a brief colloquy, the court overruled the objection, noting "I've already indicated to the jury that I will be giving them the law regarding how to interpret witness testimony . . . ." The court considered and ruled on various objections by both sides during closing arguments. There was no reason for defense counsel to think that any objection would have been futile or that an admonition could not cure any perceived harm. On the contrary, an appropriate admonition would have corrected any error.

But even reaching the merits, the contention fails. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly

---

[8] Defendant's prosecutorial misconduct argument in his motion for new trial was based on alleged references by the prosecutor to defendant's failure to present a defense, so-called *Griffin* error (*Griffin v. California* (1965) 380 U.S. 609, 615). Arguably, this was insufficient to preserve the claim defendant seeks to raise on appeal for the additional reason that it was not even based on the same ground (misconduct by vouching for witnesses). (See e.g., *People v. Hill* (1998) 17 Cal.4th 800, 820 [a specific objection on the same ground is required to preserve an issue of prosecutorial misconduct for appeal].)

17

infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 930, 421, fn. 22.) "As a general matter, '[i]mpermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' (*People v. Fierro* (1991) 1 Cal.4th 173, 211, overruled on another ground in *People v. Thomas* (2012) 54 Cal.4th 908, 941.) Similarly, evidence of a prosecutor's subjective motivations when prosecuting a case is not relevant, for '[i]t is misconduct for prosecutors to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." [Citation.] The vice of such remarks is that they "may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence." [Citation.]' (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)" (*People v. Seumanu*, *supra*, 61 Cal.4th at pp. 1329-1330, fn. omitted.)

Defendant concedes that the prosecutor, by his comments, was not attempting to bring in evidence from outside the record. Rather, defendant contends the prosecutor personally vouched for the witnesses' credibility, placing the prestige of the government behind them, and infringing on defendant's right to have the jury make an independent credibility determination. We disagree. Although the prosecutor urged the jury to believe Mitchell and Raya, the argument was based on their demeanor and testimony at trial. Based on the record, the prosecutor could reasonably argue that Mitchell would not have identified defendant repeatedly and testified confidently that he was the robber if she had any doubt. "[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [his] comments cannot be characterized as improper vouching.

18

[Citations.]" (*People v. Frye, supra,* 18 Cal.4th at p. 971.) Moreover, contrary to defendant's argument, the prosecutor did not suggest that "only a 'soulless, horrible' person could possibly be mistaken in their identification . . . ." The prosecutor's comments did not address the possibility that the eyewitnesses made a *mistake*, understandably, since mistake was the defense theory. We find the complained-of remarks to be proper comment on the evidence at trial and reasonable inferences flowing from that evidence, and not improper vouching by the prosecutor.

## DISPOSITION

The judgment is affirmed.


_____
Miller, J.


We concur:


_____
Kline, P.J.

_____
Stewart, J.